## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PRESIDIO MUNICIPAL DEVELOPMENT DISTRICT, 608 W O'Reilly St., Ste. D, Presidio, TX 79845,<br><br>       Plaintiff<br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528,<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528,<br><br>U.S. CUSTOMS AND BORDER PROTECTION, 1300 Pennsylvania Ave. NW, Washington, DC 20229,<br><br>RODNEY S. SCOTT, in his official capacity as Commissioner for Customs and Border Protection, 1300 Pennsylvania Ave. NW, Washington, DC 20229,<br><br>       Defendants. | **Case No. __-cv-_____** |

## COMPLAINT

**INTRODUCTION**

1. Defendants U.S. Department of Homeland Security (DHS), U.S. Customs and Border Protection (CBP), and their respective officers are constructing a border wall in Big Bend, a remote area in Southwest Texas located along the Rio Grande. This massive wall will run straight through the U.S. portion of the Presidio Flood Control Project (PFCP)—a levee system and boundary line built and managed by the U.S. Section of the International Boundary and Water Commission. Under this project, Defendants will replace the earthen slope of the existing levee with a concrete wall, with 30-foot steel bollard panels installed on top.

2. To protect U.S. waterways, boundary lines, and flood-control projects like the PFCP, Congress long ago passed the Rivers and Harbors Act (RHA), which generally and broadly prohibits interference with U.S.-built water features. *See* 33 U.S.C. § 408. Under the RHA, Defendants and their contractors are required to obtain permission from the Secretary of the Army—who must make specific findings and consult with the Chief of Engineers, who leads the U.S. Army Corps of Engineers—to "make use of," "build upon, alter, deface, destroy, move, injure, obstruct" or otherwise "impair the usefulness of" the PFCP. *Id.*

3. On information and belief, and despite already awarding contracts to contractors who are preparing to commence construction in Big Bend, Defendants have not sought or obtained Army approval for their planned construction on the PFCP levee. As such, Defendants' conduct is contrary to the RHA and thus violates the APA and is *ultra vires*.

4. The failure to obtain approval under Section 408 is not a mere technical error. Plaintiff Presidio Municipal Development District (PMDD) and thousands of residents of the broader Presidio County in Big Bend, Texas, rely on the PFCP to protect the area from potentially devastating flooding by the Rio Grande and the multiple tributaries that flow into the region. Following the Section 408 process would ensure that Defendants' construction will not impair the

1

Presidio levees by requiring it to undergo substantial technical and expert assessments and by affording the public, including PMDD and its community members, an opportunity for input.

## PARTIES

5. PMDD is a political subdivision of the State of Texas established by local election pursuant to Chapter 377 of the Texas Local Government Code.

6. PMDD's mission is to promote economic development in the Presidio area through infrastructure investment, industrial development, cross-border commerce, and community revitalization. PMDD is governed by a Board of Directors appointed by the City of Presidio.

7. PMDD's service area encompasses the City of Presidio, its extraterritorial jurisdiction, and adjacent areas of Presidio County where the district's economic development activities have direct impact.

8. Defendant U.S. Department of Homeland Security (DHS) is a federal agency that is responsible for border security along the U.S.-Mexico border. DHS is headquartered in Washington, D.C.

9. Defendant Markwayne Mullin is the Secretary of Homeland Security. He is being sued in his official capacity. Secretary Mullin maintains an office in Washington, D.C.

10. Defendant U.S. Customs and Border Protection (CBP) is a component of DHS headquartered in Washington, D.C., and is responsible for border patrol operations.

11. Defendant Rodney S. Scott is the Commissioner of CBP. He is being sued in his official capacity. Commissioner Scott maintains an office in Washington, D.C.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because the claims arise under federal law. This Court has further authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*

13. Venue is proper under 28 U.S.C. § 1391(e) because Defendants are agencies and officers of the United States located in this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## BACKGROUND

**I.     "Smart Wall" Construction on the U.S.-Mexico Border**

14. On Inauguration Day 2025, President Trump declared that "a national emergency exists at the southern border of the United States," and directed the Secretaries of Defense and Homeland Security to "immediately take all appropriate action, consistent with law . . . to construct additional physical barriers along the southern border." *Declaring a National Emergency at the Southern Border of the United States*, Presidential Proclamation 10886, 90 Fed. Reg. 8327, 8328 (Jan. 20, 2025). That same day, President Trump issued an Executive Order similarly declaring "the policy of the United States to take all appropriate action to secure the borders," and directing "[t]he Secretary of Defense and the Secretary of Homeland Security [to] take all appropriate action to deploy and construct temporary and permanent physical barriers to ensure complete operational control of the southern border of the United States." *Securing Our Borders*, Exec. Order 14165, §§ 2–3, 90 Fed. Reg. 8467, 8467–68 (Jan. 20, 2025).

15. Since then, and consistent with efforts undertaken during the first Trump Administration, DHS and CBP have been constructing a "Smart Wall" along the Southern Border. The "Smart Wall" is "comprised of a steel bollard wall or waterborne barrier, along with roads, detection technology, cameras and lighting and in some cases a secondary wall." *Smart Wall Frequently Asked Questions*, CBP, "What does the Smart Wall (border wall system) include?" (last modified May 21, 2026), https://perma.cc/RN8G-69AL. In areas of "unfavorable terrain or remoteness of location," DHS represents that the "Smart Wall" "will be covered by detection technology" rather than a "physical barrier." *Smart Wall Map*, CBP (last modified June 10, 2026),

3

https://perma.cc/84PB-3ZQ9. According to CBP's public website, the "Smart Wall" will span the U.S.-Mexico border from San Diego to the Gulf of Mexico, running across Southern California, Arizona, New Mexico, and Texas. *See id.*

## II.    The Big Bend Sector

### A.  Big Bend, Texas

16. Big Bend, named for the deep curve of the Rio Grande in which it sits, is a remote area of the Chihuahuan Desert in Southwest Texas along the Mexico border. It covers three counties: Presidio, Brewster, and Jeff Davis.

17. Big Bend includes a substantial amount of public land. For example, Big Bend is home to the Big Bend National Park, which consists of 801,163 acres located along the Rio Grande on the border with Mexico. *Inventory & Monitoring at Big Bend National Park*, Nat'l Park Serv., https://perma.cc/EJ6Z-QBNG. The Big Bend National Park encompasses the largest protected area of Chihuahuan Desert in the United States, supporting a diverse collection of plants and animals. *Id.*

18. Because of Big Bend's proximity to the Rio Grande, it also faces substantial flood risk. That concern is particularly heightened in Presidio, which is located near the confluence of multiple tributaries of the Rio Grande. The Rio Conchos, one of the largest tributaries, enters the Rio Grande approximately two miles upstream from the City of Presidio. The Cibolo Creek, another tributary, meets the Rio Grande just north of the City. And the Alamito Creek also joins the Rio Grande in Presidio County. *See* U.S. Section Int'l Boundary & Water Comm'n, *Environmental Impact Statement: Flood Control Improvements and Partial Levee Relocation USIBWC Presidio Flood Control Project*, ES-2 (Feb. 2010), https://perma.cc/5XD4-3NV2 ("*Environmental Impact Statement*").

19. The Presidio Flood Control Project was authorized in the U.S.-Mexico Boundary Treaty of 1970 and subsequent Congressional ratification for purposes of flood control and to establish an international boundary. *See* Pub. L. No. 92-549, §§ 101–02, 201–02, 86 Stat. 1161, 1161–63 (Oct. 25, 1972). The U.S. side of the PFCP was commissioned and is owned by the U.S. Section of the International Boundary and Water Commission (IBWC)—a binational body responsible for applying the boundary and water treaties between the U.S. and Mexico. The U.S. Section is a federal government agency operating under the guidance of the Department of State. *See* 22 U.S.C. § 277 *et seq.*

20. The PFCP was originally constructed in 1975 by altering the capacity of the river channel through the construction of berms and levees on both sides of the Rio Grande. *Environmental Impact Statement* at 1-2. In the U.S., the PFCP levee extends approximately 15 miles through Presidio, Texas, to cover approximately 13 river miles downstream and varies in height from 12 to over 20 feet. *Id.* at ES-2, 1-2, 2-1. It also includes two parallel spur levees along the Cibolo Creek—known as the north and south Cibolo Creek levees. *Id.* at ES-2.

21. In addition to the PFCP levees managed and owned by IBWC, two additional levees sit on Cibolo Creek, about two miles upstream from where the tributary meets the Rio Grande. These levees—known as the Cibolo Creek left and right levees—were built by the U.S. Army Corps of Engineers (USACE) in 1982 to reduce flood damage in Presidio and are currently operated by Presidio County. *See Presidio, TX, Cibolo Creek Left Levee*, U.S. Army Corps of Eng'rs, https://perma.cc/9BVK-D3KL; *Presidio, TX, Cibolo Creek Right Levee*, U.S. Army Corps of Eng'rs, https://perma.cc/K47T-STQE.

22. The relative locations of the PFCP, Cibolo Creek, and Presidio are illustrated in the following diagram:

5



C.W. Ruth, *Final Environmental Assessment Emergency Levee Repairs to the Presidio Flood Control Project, Station 7+000*, U.S. Section, Int'l Boundary and Water Comm'n, 2 (May 4, 2009), https://perma.cc/LUV9-AKGZ.

23. The PFCP and Cibolo Creek levees provide critical flood control to PMDD and the broader Presidio area, preventing the Rio Grande and its tributaries from spilling into the surrounding area when rainfall increases their swell. Indeed, in 2008, heavy rainfall from Tropical Depression Lowell and the resulting overflow of Mexican reservoirs caused the Rio Grande to rise to precarious levels. Lower-lying areas of Presidio were placed under mandatory evacuation, ranch lands and backyards flooded, and trees and power lines were partly submerged as water flowed over the top of portions of the PFCP. *See* Assoc. Press, *Flooding Turns Texas Town to Mud*, DeseretNews (Sep. 18, 2008), https://perma.cc/7RSJ-CE3Q. Texas Governor Rick Perry issued a disaster declaration and warned that the "situation poses an immediate danger to the residents of

Presidio." *Texas Town Races To Thwart Flood Waters*, CBS News (Sep. 19, 2008), https://perma.cc/RN3X-97YE. While emergency response efforts to fortify the compromised levee system with sandbags helped avert further damage in Presidio, across the river in Mexico, homes were flooded by over 10 feet of water. *See id.*; *Rio Grande Floods on Both Sides of Border*, NBC News (Sep. 17, 2008), https://perma.cc/7TWZ-4A2M.

24.  Following the 2008 flooding, the U.S. Section of the IBWC was forced to rebuild portions of the damaged PFCP levee. *See* U.S. Section IBWC, *Final Environmental Impact Statement, Flood Control Improvements and Partial Levee Relocation, United States Section, International Boundary and Water Commission (USIBWC) Presidio Flood Control Project (FCP), Presidio, TX*, 75 Fed. Reg. 18238, 18238–39 (Apr. 9, 2010). Those repair costs exceeded $14 million. *See, e.g.*, *USIBWC Awards Contract for Presidio Levee Construction*, U.S. Dep't of State (Aug. 16, 2010), https://perma.cc/32MN-2R8Z; *USIBWC Awards Contract for Presidio Levee Construction*, U.S. Dep't of State (Jan. 11, 2011), https://perma.cc/2FZD-ENJ7.

**B.  The Big Bend Waivers**

25. Section 102(c)(1) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), as amended, provides the Secretary of Homeland Security with authority to waive certain legal requirements that might otherwise be implicated by construction of the "Smart Wall." Specifically, it provides: "Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section. Any such decision by the Secretary shall be effective upon being published in the Federal Register." REAL ID Act of 2005, Pub. L. No. 109-13, § 102(c)(1), 119 Stat. 302, 306 (2005) (codified at 8 U.S.C. § 1103 note).

26. Relying on that authority, the DHS Secretary has repeatedly issued waivers in connection with barrier construction along various sectors of the US-Mexico border. *See, e.g.*, Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 90 Fed. Reg. 23946 (June 5, 2025) (Tucson Sector); 90 Fed. Reg. 41589 (Aug. 26, 2025) (Rio Grande Valley Sector); 90 Fed. Reg. 48281 (Oct. 15, 2025) (Tucson Sector); 90 Fed. Reg. 48282 (Oct. 15, 2025) (El Centro Sector); 90 Fed. Reg. 48283 (Oct. 15, 2025) (Del Rio Sector); 90 Fed. Reg. 48284 (Oct. 15, 2025) (Rio Grande Valley Sector); 90 Fed. Reg. 48285 (Oct. 15, 2025) (Yuma Sector); 90 Fed. Reg. 48286 (Oct. 15, 2025) (Big Bend Sector); 90 Fed. Reg. 48287 (Oct. 15, 2025) (Laredo Sector); 90 Fed. Reg. 48288 (Oct. 15, 2025) (El Paso Sector); 90 Fed. Reg. 48289 (Oct. 15, 2025) (San Diego Sector); 91 Fed. Reg. 7297 (Feb. 17, 2026) (Big Bend Sector); 91 Fed. Reg. 27969 (May 15, 2026) (Big Bend Sector); 91 Fed. Reg. 34831 (June 9, 2026) (Big Bend Sector).

27. The waivers purport to disclaim applicability of a host of legal requirements, including, depending on the waiver, laws protecting the environment; preserving archaeological resources, paleontological resources, antiquities, and Native American remains and cultural items; addressing waste disposal and noise control; and setting procedures for federal contracting.

28. Multiple DHS waivers issued under IIRIRA Section 102(c)(1) apply to Big Bend. *See* 90 Fed. Reg. 48286 (Oct. 15, 2025); 91 Fed. Reg. 7297 (Feb. 17, 2026); 91 Fed. Reg. 27969 (May 15, 2026); 91 Fed. Reg. 34831 (June 9, 2026).

29. On October 15, 2025, then-Secretary of Homeland Security Kristi Noem declared that "to achieve and maintain operational control of the border, I must use my authority under section 102 of IIRIRA to install additional barriers and roads in the Big Bend Sector." 90 Fed. Reg. 48286, 48287 (the "First Waiver"). She stated that DHS "will take immediate action to construct additional barriers and roads in the Big Bend Sector," positing that "[t]here is presently an acute

and immediate need to construct physical barriers and roads in the vicinity of the border of the

United States in order to prevent unlawful entries into the United States and achieve and maintain

operational control of the border in the Big Bend Sector." *Id.* Secretary Noem thus purported to

"waive with respect to all contracting actions necessary for the construction of physical barriers

and roads (including, but not limited to, accessing the project areas, creating and using staging

areas, the conduct of earthwork, excavation, fill, and site preparation, and installation and upkeep

of physical barriers, roads, supporting elements, drainage, erosion controls, safety features,

lighting, cameras, and sensors) in the Big Bend Sector" a host of legal and regulatory requirements.

*Id.*

30. Specifically, the First Waiver purported to waive the following:

the Administrative Procedure Act (5 U.S.C. 551, et seq.); 15 U.S.C. 631(j); 15 U.S.C. 637(d)–(f), and (h)–(k); 15 U.S.C. 644; 15 U.S.C. 657q; 28 U.S.C. 1491(b) (to the extent that it authorizes injunctive relief or any form thereof that would interfere with the expeditious construction of barriers and roads); 31 U.S.C. 3553(c) and (d)(3); 40 U.S.C. 1101 *et seq.*; 41 U.S.C. 1126; 41 U.S.C. 1708(a), (c), (e)–(g); 41 U.S.C. 1901(c), (d), and (e); 41 U.S.C. 3301; 41 U.S.C. 3302(b)–(e); 41 U.S.C. 3304; 41 U.S.C. 3306(a)–(c); 41 U.S.C. 3307(b)– (d), (e)(4), and (e)(5)(C); 41 U.S.C. 3309; 41 U.S.C. 3502; Section 880 of Division A, Title VIII of Public Law 115–232 (41 U.S.C. 3701, Note); 41 U.S.C. 4103(c), (d)(3)–(4); 41 U.S.C. 4104(b); 41 U.S.C. 4105(c)–(d), (f)(2)–(3), (g); 41 U.S.C. 4106(c)–(d); 41 U.S.C. 6101(b)(1); 13 CFR part 125, and 127.503(g); 48 CFR 7.102; 48 CFR part 10; 48 CFR 16.504(c); 48 CFR 16.505(a)(4), (a)(8)(i) and (iii), (a)(9), and (b); 48 CFR 17.207; 48 CFR 22.404–5; 48 CFR subpart 22.5; 48 CFR 28.102–1(c); 48 CFR 33.103(f).

*Id.* at 48287. Most of these provisions impose requirements related to government contracting.

31. On February 17, 2026, Secretary Noem issued a further waiver as to the Big Bend Sector,

making similar findings about the "immediate" need "to construct additional physical barriers and

roads." 91 Fed. Reg. 7297, 7298 ("Second Waiver"). Secretary Noem invoked Section 102(c) to

waive "with respect to the construction of physical barriers and roads": the National Environmental

Policy Act; the Endangered Species Act; the Federal Water Pollution Control Act; the National

Historic Preservation Act; the Migratory Bird Treaty Act; the Migratory Bird Conservation Act;

the Clean Air Act; the Archeological Resources Protection Act; the Paleontological Resources Preservation Act; the Federal Cave Resources Protection Act of 1988; the National Trails System Act; the Safe Drinking Water Act; the Noise Control Act; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act; the Comprehensive Environmental Response, Compensation, and Liability Act; the Archaeological and Historic Preservation Act; the Antiquities Act; the Historic Sites, Buildings, and Antiquities Act; the Eagle Protection Act; the Native American Graves Protection and Repatriation Act; the Administrative Procedure Act; Section 438 of the Energy Independence and Security Act; the National Fish and Wildlife Act of 1956; the Fish and Wildlife Coordination Act; the Farmland Protection Policy Act; the Wild Horse and Burro Act; the Wild and Scenic Rivers Act; and the Federal Land Policy and Management Act. *Id.*

32. On May 15, 2026, Secretary Mullin issued another waiver as to Big Bend, making similar findings about the "immediate" need "to construct additional barriers and roads . . . in the Big Bend Sector." 91 Fed. Reg. at 27969–70 ("Third Waiver"). The Third Waiver purported to waive the same legal requirements as to the same activities as the Second Waiver, and further waived the Wilderness Act, the National Park Service Organic Act, the National Park Service General Authorities Act, 16 U.S.C. § 156, 16 U.S.C. § 157, 16 U.S.C. § 157c, and 16 U.S.C. § 157d. *Id.*

33. On June 9, 2026, Secretary Mullin issued a republication of the Third Waiver, correcting an "incorrect" "project area description" in the Third Waiver. *See* 91 Fed. Reg. at 34832 ("Fourth Waiver").[1]

---

[1] The waivers are inconsistent in their definition of the Big Bend Sector project area. The Second Waiver applies to the area "[s]tarting at approximately GPS point 31.037623, –105.579877 and extending south and east to approximately GPS point 29.325866, –104.046466." 91 Fed. Reg. at 7298. The Third Waiver applies to the area "[s]tarting at approximately GPS point 29.7275568–101.6848011 and extending east to approximately GPS point 29.727557–102.684802." *Id.* at 27969. The Fourth Waiver applies to the area "[s]tarting at approximately GPS point 29.325866, -104.046466 and extending east to approximately GPS point 29.728522, -102.683945." *Id.* at

### C.  Construction in the Big Bend Sector

34. As the waivers demonstrate, DHS has made the decision to construct its "Smart Wall" across the Big Bend region of Texas. And it is already barreling ahead to implement this decision, including by awarding contracts and putting boots on the ground to begin construction.

35. According to CBP's website, "[f]rom February to May 2026," CBP "sought public input on the potential impacts to the environment, culture, and commerce, including potential socioeconomic impacts, and quality of life" for its "planned . . . construction and maintenance of approximately[] 175 miles of primary border barrier in Hudspeth, Jeff Davis, and Presidio counties, Texas." *Border Barrier System– Hudspeth, Jeff Davis, and Presidio Counties, Texas – January 2026*, CBP (last modified May 29, 2026), https://perma.cc/RQ8M-E5HT. Specifically, CBP indicated that the border barrier "will consist of 30-foot-high six-inch-squared diameter steel bollards, spaced approximately four inches apart with anti-climb features," as well as elements such as construction of maintenance and patrol roads and installation of drainage gates. *Id.* CBP also indicated that "[a]djacent areas will be cleared and used to store construction materials and equipment" and that "[w]ater is anticipated to be needed for construction and dust suppression activities to maintain air quality near the project," though it did not specify where it will draw the water from. *Id.*

36. In February 2026, Big Bend area landowners received letters from CBP notifying them of "plann[ed] border barrier system construction along the southwest border, including in Presidio County, Texas" and indicating that CBP "may need to enter [their] property for either construction or access purposes." Letter from CBP, *Subject: Notice of Interest—Property Located Near Planned Border Barrier Construction Projects* (Feb. 20, 2026), https://perma.cc/NR24-J3VQ

---

34832. The First Waiver does not provide the coordinates for the area at issue. *See* 90 Fed. Reg. at 48287–88.

(cited in Mary Cantrell, *Government Documents Reveal Big Bend Border Wall Details as Opposition Grows*, Marfa Pub. Radio (Feb. 27, 2026), https://perma.cc/2LDV-GF2F). Recipients of those letters included multiple property owners whose land lies in the immediate vicinity of the PFCP.

37. Beginning in or about February 2026, the U.S. Army Corps of Engineers, Fort Worth District, engaged property owners in the Presidio area regarding acquisition of land related to border-wall construction.

38. The following month, in March 2026, CBP held a meeting with local elected officials. According to reporting, CBP represented in that meeting that "Smart Wall" construction in Presidio and the surrounding area would begin as soon as June 1. *See* Rob D'Amico, *CBP Meetings Confirm Details on Wall Construction Slated for June*, The Big Bend Sentinel (March 20, 2026), https://perma.cc/56BD-KB9U.

39. According to CBP's "Smart Wall Map," which CBP represents is "updated weekly as construction progresses," construction in the Big Bend Sector is progressing. *See Smart Wall Map*, CBP (June 10, 2026), https://perma.cc/84PB-3ZQ9 (interactive map).

40. The Big Bend Sector is divided into five CBP project segments. *See id.*

41. Project segments 1, 2, and 3 are on the west side of the bend. *Id.* They include a "Primary Border Wall System" made of "[B]ollard Barrier" and spanning 47.4, 68.2, and 56.3 miles, respectively. Their status is listed as "[A]warded," meaning that "contracts . . . have been awarded, and the project is in the design phase or early construction activities have begun." *Id.*

42. DHS awarded a $1,025,996,158 contract to Barnard Construction Company, Inc., for border barrier construction monitoring services for the Project 1 segment. *Barnard Construction Company, Inc. Contract Summary*, USASpending.gov, https://perma.cc/J9JE-MAFM. The start

12

date, *i.e.* "when the awarded recipient's work begins or when the award is otherwise effective," was March 5, 2026. *Id.*

43. DHS awarded a $1,223,124,000 contract to Fisher Sand & Gravel Co. for "border wall construction - vertical barrier" for the Project 2 segment. *Fisher Sand & Gravel Co. Contract Summary*, USASpending.gov, https://perma.cc/NF9G-J5HJ. The start date was February 13, 2026. *Id.*; *see also* Letter from the U.S. Customs and Border Prot. to Mr. John T. Kennedy, Executive Director & Registered Agent, Presidio Mun. Dev't Dist., Ex. A at 1 (indicating that Fisher Sand and Gravel Co. was contracted "to construct approximately 68 miles of primary border wall system in [U.S. Border Patrol]'s Presidio Station's Area of Responsibility in Texas").

44. DHS awarded another $960,423,540 contract to Barnard Construction Company, Inc., for border barrier construction for the Project 3 segment. *Barnard Construction Company, Inc., Contract Summary*, USASpending.gov, https://perma.cc/JKY2-9W4S. The start date was March 5, 2026. *Id.*

45. DHS also awarded $4,425,343 to Tierra Right of Way Services Ltd. for border barrier construction monitoring services for the Project 3 area. *Tierra Right of Way Services Ltd, Contract Summary*, USASpending.gov, https://perma.cc/EX6M-W262. The start date was April 29, 2026. *Id.*

46. Big Bend Project 4, which is in the area closest to Big Bend National Park, includes "Vehicle Barrier System[s]," "[Detection] Technology," and "Patrol Road[s]," depending on the area. *Smart Wall Map*, CBP (June 10, 2026), https://perma.cc/84PB-3ZQ9 (interactive map). Its status is listed as awarded. *Id.*

47. DHS awarded a $1,720,040,000 contract to Southwest Valley Constructors Co. for "construction task order for border wall" in the Project 4 segment. *Southwest Valley Constructors*

13

*Co. Contract Summary*, USASpending.gov, https://perma.cc/V6WZ-EZCT. The start date was May 11, 2026. *Id.*

48. Big Bend Project 5, which is to the east of the bend, is a "Bollard Barrier System" of 156.6 miles. *Smart Wall Map*, CBP (June 10, 2026), https://perma.cc/84PB-3ZQ9 (interactive map). Its status is listed as awarded. *Id.*

49. DHS awarded another $2,594,040,000 contract to Fisher Sand & Gravel Co. for "Border Barrier Design Build" for the Project 5 segment. *Fisher Sand & Gravel Co. Contract Summary*, USASpending.gov, https://perma.cc/9GPK-ZQ9K. The start date was June 3, 2026. *Id.*

50. PMDD is located in the area of Big Bend Project 2. *See* Ex. A at 1.

51. PMDD has been contacted by border wall contractors and/or subcontractors seeking to use portions of PMDD's Industrial Park—approximately 400 acres of land that PMDD is developing and leasing to support economic growth in PMDD—in connection with "Smart Wall" construction activities. In or about early February 2026, a PMDD official was contacted by Barnard Construction Company, Inc., seeking to lease or buy land within the Industrial Park for a 500-RV "man camp" to house border-wall construction workers. PMDD denied that request as inconsistent with the planned uses for the Industrial Park.

52. PMDD similarly took no action on a March 2026 request from a local cement factory, Big Bend Materials, to lease approximately 15 acres of the Industrial Park land in connection with border-wall construction. Big Bend Materials contacted PMDD again in June 2026 requesting to dig up clay from the Industrial Park for use as fill material. On information and belief, Big Bend Materials is a subcontractor of Fisher Sand & Gravel Co., and both entities are using roughly 14 acres of private property directly adjacent to PMDD's property in the Presidio Industrial Park to support wall construction.

14

53. In recent weeks, PMDD officials have witnessed contractors using heavy equipment to clear that entire parcel of land and installing modular offices. On information and belief, those workers are from Fisher Sand & Gravel Co. and/or its corporate affiliate, Fisher Industries, and are using the land for project offices, to stage materials, and to house equipment for "Smart Wall" construction.

54. PMDD officials have also witnessed other construction mobilization in Presidio and the broader Big Bend region. This includes movement of heavy equipment, construction and improvement of access roads, and gravel mining in Big Bend. Survey crews have been operating in the immediate vicinity of the PFCP since March or April 2026. In or about late April 2026, over 20 Fisher Sand & Gravel Co. trailers were placed in the Loma Paloma RV park in Presidio. *See, e.g.*, Rob D'Amico, *Presidio Man Rents RV Slots to Wall Contractors*, The Big Bend Sentinel (May 4, 2026), https://perma.cc/U2XU-ZJSV. On information and belief, those trailers are intended for use by workers involved in wall construction projects in Big Bend Project 2. *See id.*

55. In June 2026, a CBP spokesman reportedly told Marfa Public Radio that installation of the actual border wall panels in Big Bend Project Areas 1 and 2 are scheduled to begin in late summer or early fall. Travis Bubenik, *Construction Start Nears for Big Bend Area Border Wall*, Marfa Pub. Radio (June 7, 2026), https://perma.cc/VK3R-TW4B.

56. Due to concerns about the impact of the Big Bend Sector of the "Smart Wall" on PMDD— and, in particular, its impacts on the safety and efficacy of the PFCP and Cibolo Creek levees— PMDD submitted a comment letter in response to the CBP solicitation and contacted federal government entities seeking more information about construction around the levees.

57. On or about March 30, 2026, Paul Enriquez, Director of Infrastructure Portfolio, Program Management Office Directorate, U.S. Border Patrol, responded to PMDD's inquiry about the "IBWC levee"—*i.e.* the PFCP—by representing that "[t]he planned alignment for the border wall

15

in the Presidio, Texas area as part of the Big Bend 2 Wall Project, is anticipated to follow the existing levee. This will involve constructing a reinforced concrete levee wall adjacent to and matching the height of the current levee, with 30-foot steel bollard panels installed on top. This approach is intended to enhance both security and flood protection in the area." Ex. A at 1-2.

58. On or about April 30, 2026, the U.S. Section of the IBWC responded to a PMDD inquiry about the levees. It reported that, based on a March 30, 2026 meeting with CBP, "CBP plans to construct a concrete levee wall on the river side of the existing earthen levee and place the bollard wall on top of the concrete levee wall." Letter from the Int'l Boundary and Water Comm'n to Mr. John T. Kennedy, Executive Director & Registered Agent, Presidio Mun. Dev't Dist. (Apr. 30, 2026), Ex. B at 1. "[T]he concrete wall will replace the slope of the existing levee." *Id.*

59. Still concerned about the impact of CBP construction on the levees, PMDD contacted Director Enriquez requesting, among other things, "[t]he hydraulic and hydrologic analysis demonstrating that the proposed reinforced concrete border-barrier wall and thirty-foot steel bollard installation, as designed, can be constructed and maintained on and adjacent to the Presidio Valley Flood Control Project without diminishing the levee's design conveyance, compromising its structural integrity, or altering flows within the Rio Grande floodplain" as well as "[t]he geomorphic and sediment-transport analysis evaluating the proposed construction against post-2008 conditions on the Rio Grande, the Rio Conchos, Cibolo Creek, and Alamito Creek." Director Enriquez advised by email on May 28. 2026, that "the engineering documents you have requested are not shared with the public . . . to protect sensitive information and national security."

## III.   Defendants Failed to Obtain USACE Permission Under the Rivers and Harbors Act

60. On or about May 11, 2026, the Department of the Army, USACE, responded to a PMDD inquiry about the levees.

16

61. The USACE indicated that it had "informally" contacted CBP "to discuss their process," but "[t]o date, the District has not been formally engaged by DHS, CBP, or any contractor regarding proposed construction on or adjacent to the Presidio Flood Control Project." Letter from the U.S. Army Corps of Eng'rs to Mr. John T. Kennedy, Executive Director & Registered Agent, Presidio Mun. Dev't Dist. (May 11, 2026), Ex. C at 1.

62. That letter further acknowledged that "the Presidio, TX, Cibolo Creek Left Levee and the Presidio, TX, Cibolo Creek Right Levee" are "USACE-constructed levees," and that "if proposed construction intersects" with those levees, it "would necessitate permission under Section 14 of the Rivers and Harbors Act of 1899 (33 U.S.C. § 408)." *Id.*

63. Specifically, the RHA makes it unlawful "to take possession of or make use of for any purpose, or build upon, alter, deface, destroy, move, injure, obstruct by fastening vessels thereto or otherwise, or in any manner whatever impair the usefulness of any. . . levee . . . or other work built by the United States, . . . in whole or in part, for the preservation and improvement of any of its navigable waters or to prevent floods, or as boundary marks, . . . []or remove for ballast or other purposes any stone or other material composing such works." 33 U.S.C. § 408(a).

64. The only exceptions provided by Section 408 are (1) if for "temporary occupation or use," "the Secretary of the Army . . . on the recommendation of the Chief of Engineers, grant[s] permission . . . when in his judgment such occupation or use will not be injurious to the public interest"; or (2) if for "alteration or permanent occupation or use," "the Secretary . . . on the recommendation of the Chief of Engineers, grant[s] permission . . . when in the judgment of the Secretary such occupation or use will not be injurious to the public interest and will not impair the usefulness of such work." *Id.*

65. None of the DHS Big Bend waivers purport to waive the Rivers and Harbors Act.

17

66. As of the date of filing, the USACE Section 408 Database does not show any Section 408 request related to "Smart Wall" construction on the PFCP or Cibolo Creek levees. *See USACE Regulatory and Section 408 Publicly Available Data*, U.S. Army Corps of Eng'rs, https://perma.cc/4Z58-6X38.

### IV.    Impacts on the Presidio Levees and PMDD

67. As described *supra* ¶¶ 18–23, the Presidio levees provide critical protection from devastating floods in PMDD. But they are still fallible, as Presidio experienced during flooding in 1978 and 2008. Even the post-2008 storm repairs restored the PFCP levee only to its pre-existing 25-year flood protection standard, *see* 75 Fed. Reg. at 18239, rather than meeting the federal government's 100-year flood standard, *see, e.g.*, *Glossary*, Fed. Emergency Mgmt. Agency, https://perma.cc/9BY6-B76G.[2]

68. As the USACE recognizes, the areas behind left and right Cibolo Creek levees also "could potentially flood," including a "2.22 square mile[] . . . area" that has "residential and commercial areas with a population of over 2,830 people, 1,113 structures, $201M property value and . . . 2 types of critical infrastructure (Fire Station & Law Enforcement)." *Presidio, TX, Cibolo Creek Right Levee*, U.S. Army Corps of Eng'rs, https://perma.cc/K47T-STQE; *Presidio, TX, Cibolo Creek Left Levee*, U.S. Army Corps of Eng'rs, https://perma.cc/9BVK-D3KL.

69. Defendants' failure to obtain permission under Section 408, compounded by their failure to share any hydraulic analysis, flood risk assessment, or engineering studies regarding the impacts of their "Smart Wall" construction on the levees, raises significant concerns about whether the "Smart Wall" construction will impair the Presidio levees. If not properly planned and carried out, construction on the federal flood-control works in Presidio could compromise their integrity and

---

[2] These standards are based on the frequency with which a flood of a specific size will occur. A 25-year flood has a 4% chance of occurring in a given year. A 100-year flood has a 1% chance of happening in a given year.

leave the region vulnerable to deadly flash floods capable of destroying infrastructure, homes, farmland, and agriculture.

70. Replacing the earthen levee slope with a rigid concrete structure topped with 30-foot steel bollard panels would materially alter the PFCP's hydraulic performance and structural behavior during flood events. This could include its flow conveyance and floodway capacity; flow velocities; scour (erosion caused by waterflow) and undermining at the levee toe (where the slope meets the natural ground) and foundation (the loose sand and gravel that supports the earthen embankment); debris catchment and blockage; under-seepage (when water seeps beneath the levee) and piping (internal erosion from soil being washed out from within or beneath the levee) through the levee's loose sand-and-gravel foundation; and the dead-load (static weight), lateral-load (sideways pressure from water, debris, wind, or seismic forces), and overall weight distribution imposed on an embankment not designed to carry a concrete structure. The region's exposure to extreme wind events and storms (including the approaching monsoon season), and its location within a seismically active geologic zone and downstream of the mountains further increase potential risks.

71. Nor are the risks limited to the PFCP. The left and right Cibolo Creek levees are hydraulically connected to the PFCP, because the Cibolo Creek empties into the Rio Grande. Thus, whether and how easily the creek can drain depends on how high the Rio Grande's water level is at their meeting point. When the Rio Grande runs high, it can act like a plug at the mouth of the Cibolo Creek, causing water to back up behind the Cibolo levees. Construction on the PFCP that alters flood conveyance and raises water levels can produce backwater that further raises water levels around the left and right levees and increases flood risks in that system, as well. Higher water pressure and levels behind the left and right Cibolo Creek levees can lead to increased erosion, damage as faster waters turn up sediment and carry debris, and overflow of water above

the levee walls (overtopping).Indeed, experts analyzing flooding risks presented by other segments of the "Smart Wall" have raised alarms about the safety and planning behind CBP's work. R.S. Johnson, a Texas Licensed Professional Geoscientist, issued an opinion letter in May 2026 regarding impacts of border-wall construction on an area of Big Bend about 100 miles upstream of Presidio. Mr. Johnson determined that "a conventional continuous border wall is not a durable long-term structure . . . unless it is designed as a highly specialized flood-conveyance and debris-passage system" due to the high-risk of flash flooding in many areas "downstream of the Viejo Mountains." Mr. Johnson further opined that a border wall "would remain vulnerable because floodwater in this environment carries sediment and debris" and can "commonly [cause] foundation scour, wall undermining, lateral bypass erosion, and eventual structural failure." As a result, Mr. Johnson stressed the importance of "detailed site specific geologic, geomorphic, hydrologic, and hydraulic evaluation." While Mr. Johnson was focused on the impacts of the Sierra Vieja, Presidio experiences similar terrain effects given its location below the Chinati Mountains, through which the Cibolo Creek flows.

72. The Rio Grande International Study Center also recently commissioned a report from Dr. Mark Tompkins, a Ph.D.-trained fluvial geomorphologist with more than 28 years of experience consulting on rivers through the U.S., to analyze the impact of CBP's construction of a border and waterborne barrier system downstream of Presidio in Webb and Zapata Counties in South Texas. Dr. Tompkins concluded that CBP's "massive" changes "will change the river corridor dramatically" and "immediately." According to Dr. Tompkins, "[p]ortions of the proposed wall . . . will fail during extreme high flows," which in turn "will cause catastrophic flooding, damage and destruction to property, and risks to the health and safety of people near the river corridor." He further stated that "constructing the proposed system without publicly documenting its design

20

and incorporating appropriate risk mitigation measures violates the basic professional standard of care that must be met for projects with such high risks."

73. The Section 408 approval process guards against exactly these sorts of risks. For example, a requester must meet with USACE, provide "a detailed alteration scope including the flood control boundary, constraints, and other pertinent information," after which the Army "determine[s] potential technical (Geotech, Hydrology & Hydraulics, Structural calculation), environmental/NEPA . . . and real estate documentation requirements" that must be met to even have the request considered. *Section 408 Permission Information*, U.S. Army Corps of Eng'rs, https://perma.cc/UD3K-FB4P. USACE technical staff—including Civil Design, Hydrology & Hydraulics, Geotech, Geology, Structural, Reservoir regulation, Dam & Levee Safety, Operations, Construction—assist in evaluating the proposal, including "for impacts to flood conveyance, structural integrity, operation and maintenance . . . and flood fighting capabilities as well as meeting Corps policy and criteria." *Id.* Even after permission is granted under Section 408, the requester must comply with post-permission oversight requirements to ensure construction accords with the approved plans and specifications. *Id.*

74. The Section 408 approval process also allows affected entities like PMDD to voice their concerns and influence the agency's decision to grant a Section 408 permit. Under USACE policy, the agency "must make diligent efforts to solicit public input as part of the decision-making process for a Section 408 request." James C. Dalton, P.E., Director of Civil Works, EC 1165-2-220, *Policy and Procedural Guidance for Processing Requests to Alter US Army Corps of Engineers Civil Works Projects Pursuant to 33 USC 408*, U.S. Army Corps of Eng'rs (Sept. 10, 2018), https://perma.cc/W966-E6XD; *see Extension of EC-1165-2-220, Policy and Procedural Guidance for Processing Requests to Alter US Army Corps of Engineers Civil Works Projects Pursuant to 33 U.S.C. 408*, U.S. Army Corps of Eng'rs (Nov. 14, 2023) (extending effective period of EC

21

1165-2-220), https://perma.cc/66NQ-E467. Had the Defendants followed the process for obtaining approval under Section 408, PMDD would have provided input. But because DHS, CBP, and/or its contractors have failed to seek USACE approval, PMDD had no opportunity to do so.

75. Indeed, the lack of a Section 408 process is particularly concerning given that CBP has not otherwise provided data to the U.S. Section of IBWC or coordinated with the USACE as it typically would. In its letter to PMDD, the U.S. Section of the IBWC advised that "[t]ypically, project proponents such as CBP develop and submit hydraulic models for USIBWC's review, when the proposed structures are located within the Rio Grande floodplain" to allow "[t]he USIBWC [to] evaluate[] the submittals for impacts on the structural integrity of the levees and facilities," among other things. Ex. B at 1-2. The U.S. Section advised that while CBP has kept it "informed of its plans," "[t]he USIBWC has not yet received any designs for review for border barrier segments within the Big Bend Sector." *Id.* at 2.

76. Similarly, the USACE advised in its letter to PMDD that USACE "typically would be involved in an engineering review if proposed construction intersects with USACE-constructed levees," but that USACE "has not been formally engaged by DHS, CBP, or any contractor regarding proposed construction on or adjacent to the Presidio Flood Control Project." Ex. C at 1.

77. To make matters even worse, Fisher Sand & Gravel Co., the contractor awarded for work in the Projects 2 and 5 segments and whose trailers have appeared in Presidio, *see supra* ¶¶ 43, 49, and its corporate affiliate Fisher Industries, were previously sued by the Department of Justice on behalf of the U.S. Section of the IBWC for allegedly performing privately funded border wall construction without a proper hydraulic analysis in the Rio Grande banks. *See United States v. We Build the Wall, Inc. et al.*, No. 19-cv-00403, Dkt. No. 68 ¶¶ 14, 16–28 (S.D. Tex. Aug. 25, 2021). As alleged, runoff from seasonal rains in the area of their unapproved work caused substantial erosion along their bollard fence structure and the bank of the Rio Grande, threatening the

22

structural integrity of their fence, degrading the riverbank, and potentially shifting the international boundary line. *Id.* ¶¶ 34–36. *See* Perla Trevizo & Jeremy Schwartz, *Settlement Reached Over Private Border Wall, but Experts Say it Won't Stop the Environmental Damage*, The Tex. Trib. (June 4, 2022), https://perma.cc/Y2F7-E6P5 (discussing case settlement).

78. The failure to obtain Section 408 permission, and the prospect of unreviewed construction on or affecting the Presidio levees, threatens PMDD's core economic-development mission and its proprietary and financial interests. PMDD's principal asset is the Industrial Park, which, as noted, PMDD is developing and leasing to support economic growth in Presidio and which is located less than a mile from the PFCP and behind a USACE-constructed levee.

79.  For example, PMDD has leased 42 acres in the Industrial Park to a geothermal energy developer. PMDD is also developing other land for uses such as greenhouses, agricultural-processing, and cold-storage facilities tied to binational trade with Chihuahua; warehousing; data centers; and light manufacturing.

80. CBP's construction of the border wall is frustrating PMDD's ability to develop the Industrial Park, damaging its financial interests and undermining its economic-development efforts. Developers who might otherwise be interested in leasing land from PMDD are concerned about flood risk and, in particular, the effects of border-wall construction. The geothermal energy developer with a lease in the Industrial Park has inquired about flood risk and how barrier construction will affect stormwater management. A data center developer who was a prospective lessee also asked PMDD about flood risk and infrastructure resilience. But without any publicly available analysis of the impact of the border-wall construction, PMDD has limited ability to provide any assurances. This uncertainty is a recurring concern in PMDD's ongoing negotiations, constraining PMDD's ability to attract and plan investment in the park.

81. "Smart Wall" construction has also caused other harms to PMDD's land. The Fisher contractors clearing land on the adjacent parcel to the Presidio Industrial Park, *see supra* ¶ 53, used their heavy equipment to clear vegetation from approximately five acres of PMDD-owned land without permission.

82. As a result of CBP's failure to obtain USACE permission under Section 408, and consistent with its mission of promoting economic development and community improvement in Presidio, PMDD has been forced to expend significant resources. It has commissioned, at its own expense, an architectural and engineering firm (Parkhill) to conduct a flood-risk regulatory assessment, including the impact of CBP's plans on the levees' integrity. The first phase of Parkhill's assessment cost PMDD roughly $15,000, and PMDD expects that, if construction proceeds, further phases will be necessary and even more expensive. PMDD has also spent significant staff time and resources contacting CBP, USACE, and IBWC in an attempt to learn about CBP's plans for the Presidio levees. These unbudgeted costs have forced PMDD to spend money that it would otherwise use to fund its operations and economic-development programs.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF THE APA, 5 U.S.C.§ 706(2)(A) – Contrary to Law

83. The paragraphs above are incorporated and reasserted as if fully set forth here.

84. A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

85. The APA's contrary to law cause of action is not a "legal requirement" within the meaning of Section 102(c)(1) of the IIRIRA.

86. Construction of the Big Bend Sector is not in accordance with the Rivers and Harbors Act.

87. The PFCP was built by the United States to prevent floods and as a boundary mark.

88. The left and right Cibolo Creek levees were built by the United States to prevent floods.

89. On information and belief, DHS and CBP have decided to, as part of their construction of the Big Bend Sector, replace the slope of the existing levee in the PFCP by constructing a new concrete levee wall with a bollard wall atop it. *See supra* ¶¶ 57, 58.

90. Under the RHA, such construction would involve "tak[ing] possession of" "mak[ing] use of for any purpose," "build[ing] upon," "alter[ing]," "destroy[ing]" "mov[ing]," "injur[ing]," and/or "impair[ing] the usefulness of" of a "levee . . . built by the United States . . . to prevent floods, or as boundary marks," and/or "remov[ing]. . . any stone or other material composing such work[]." 33 U.S.C. § 408(a).

91. On information and belief, neither DHS nor CBP, nor anyone acting on their behalf, has obtained permission from the Secretary of the Army. *See supra* ¶¶ 61–62, 66.

## COUNT II
## *ULTRA VIRES* ACTION
## (IN THE ALTERNATIVE)

92. The paragraphs above are incorporated and reasserted as if fully set forth here.

93. A non-statutory right of action is available to challenge federal agencies' *ultra vires* actions where they "amount to a 'clear departure by the [agency] from its statutory mandate' or [are] 'blatantly lawless' agency action." *Fed. Express Corp. v. United States Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) (first alteration in original) (quoting *Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11*, 393 U.S. 233, 238 (1968)).

94. DHS and CBP's construction of the Big Bend Sector of the "Smart Wall" is contrary to the specific prohibition in 33 U.S.C. § 408 against "tak[ing] possession of" "mak[ing] use of for any purpose," "build[ing] upon," "alter[ing]," "destroy[ing]" "mov[ing]," "injur[ing]," and/or "impair[ing] the usefulness of" of a "levee . . . built by the United States," and/or "remov[ing]. . . any stone or other material composing such work[]."

25

95. On information and belief, neither DHS nor CBP, nor anyone acting on their behalf, has obtained permission from the Secretary of the Army. *See supra* ¶¶ 61–62, 66.

96. Plaintiff thus has a non-statutory right of action to declare unlawful and enjoin Defendants' *ultra vires* actions.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court:

a.  Declare that Defendants' construction of the Big Bend Sector of the "Smart Wall" violates the Rivers and Harbors Act;

b.  Hold unlawful, vacate, set aside, and enjoin Defendants' construction of the Big Bend Sector of the "Smart Wall";

c.  Issue a stay of the Big Bend Sector under 5 U.S.C. § 705;

d.  Award Plaintiff its attorney's fees and costs for this action;

e.  Award such other and further relief as the Court deems just and proper.

Dated: June 17, 2026

Respectfully submitted,

*/s/ Louis Katz*
Louis Katz (D.C. Bar No. 90003861)
Laura Bakst (DC Bar No. 1782054)*
Brian Netter (DC Bar No. 979362)
Skye L. Perryman (DC Bar No. 984573)
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
lkatz@democracyforward.org
lbakst@democracyforward.org
bnetter@democracyforward.org
sperryman@democracyforward.org

*Counsel for Plaintiff*

* Motion to appear *pro hac vice* forthcoming

26