**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

PRESIDIO MUNICIPAL DEVELOPMENT
DISTRICT,

          Plaintiff,

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY; MARKWAYNE MULLIN, in
his official capacity as Secretary of Homeland
Security; U.S. CUSTOMS AND BORDER
PROTECTION; and RODNEY S. SCOTT, in
his official capacity as Commissioner for
Customs and Border Protection,

          Defendants.

**Case No. 26-cv-2146**

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A STAY UNDER
5 U.S.C. § 705 AND/OR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................2

    I.    Big Bend, Texas, and the Presidio Levees...........................................................2

    II.   Border Wall Construction in Big Bend...............................................................4

    III.  The Big Bend Waivers........................................................................................5

    IV.  Construction in the Big Bend Sector ..................................................................8

    V.   The Rivers and Harbors Act and the Presidio Levees ......................................11

    VI.  Harms to Presidio and PMDD ..........................................................................12

LEGAL STANDARD............................................................................................................16

ARGUMENT........................................................................................................................16

    I.    Plaintiff is Likely to Succeed on the Merits.......................................................16

        A.  Big Bend Sector Construction Violates the Rivers and Harbors Act ............17

        B.  Plaintiff May Properly Bring Suit Under the APA ........................................18

          1.  Construction of the Big Bend Sector of the Border Wall Constitutes Final Agency Action ................................................................................18

          2.  The IIRIRA Waiver Does Not Apply to an APA Contrary to Law Cause of Action or Section 705 Relief........................................................................20

        C.  Alternatively, Failure to Comply with RHA is *Ultra Vires*...........................22

    II.   The Big Bend Construction is Likely to Irreparably Harm Plaintiff.................22

    III.  The Balance of Equities and the Public Interest Favors a Stay ........................24

CONCLUSION.....................................................................................................................26

**INTRODUCTION**

The City of Presidio sits on the banks of the Rio Grande, near the confluence of several major tributaries, in the Big Bend region of Texas. In 2008, in the wake of a heavy storm, the river dramatically overflowed its banks. The floodwaters overwhelmed a levee system and triggered a transnational emergency response. In the aftermath of the 2008 floods, the United States spent years carefully engineering and rebuilding portions of the levee system to protect this sensitive terrain.

The U.S. Department of Homeland Security (DHS) and U.S. Customs and Border Patrol (CBP) have now decided to build a border wall through the Big Bend region of Texas. Despite relatively low levels of undocumented border crossings in Big Bend due to the rural geography and rough terrain, Defendants are plowing ahead with a plan to replace a large earthen levee wall that contains the Rio Grande with a concrete structure topped by 30-foot bollard panels. Ordinarily, changes to a levee system of this magnitude would undergo significant advanced engineering reviews and coordination to ensure that they will not compromise flood protection and structural integrity. Indeed, the Rivers and Harbors Act obligates the United States to obtain engineering approval from the U.S. Army, which maintains the U.S. Army Corps of Engineers to conduct the required analysis. *See* 33 U.S.C. § 408. Nevertheless, Defendants have ignored their statutory obligation to seek the Army's review. They are instead barreling ahead, awarding construction contracts to companies that are already beginning operations in Presidio and the broader Big Bend area.

Plaintiff, Presidio Municipal Development District, a political subdivision of Texas, seeks a stay and/or preliminary injunctive relief halting construction of the Big Bend Sector due to Defendants' failure to comply with their legal obligations under Section 408. Because of the clear statutory violation, Plaintiff is likely to succeed on its claim that Defendants have acted contrary

1

to law under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), or, in the alternative, *ultra vires*. The harm to PMDD and the public is severe and irreparable. Presidio's geography and climate already leave it predisposed to flooding, and alterations to the levee system without appropriate technical planning increase the risk of levee failure and devastating floods. PMDD, in particular, owns and is actively developing hundreds of acres of property in an Industrial Park near the levees. Not only would a flood damage or destroy its land, but the increased risk alone is deterring investors and undermining its economic-development efforts. PMDD has also experienced pocketbook injuries, having had to expend staff time and district money to investigate Defendants' plans and obtain an outside safety assessment. Meanwhile, Defendants face minimal harms from an injunction as they themselves admit that their alternative enforcement tactics are effective at keeping unauthorized border crossings in Big Bend extremely low.

## BACKGROUND

### I.    Big Bend, Texas, and the Presidio Levees

On the edge of the U.S.-Mexico border inside the deep bend of the Rio Grande sits Presidio, a remote city within the broader Big Bend region of Southwest Texas. Presidio is located at the confluence of multiple tributaries of the Rio Grande. That includes the Rio Conchos, which enters the Rio Grande approximately two miles upstream of the City, and the Cibolo Creek, which joins the Rio Grande just north of Presidio. *See* U.S. Section Int'l Boundary & Water Comm'n, *Environmental Impact Statement: Flood Control Improvements and Partial Levee Relocation USIBWC Presidio Flood Control Project*, 2-1 (Feb. 2010), https://perma.cc/5XD4-3NV2 ("*Environmental Impact Statement*"). As a result, Presidio is also home to a complex levee system that protects the area from mass flooding.

That system is composed of two main parts. First, the Presidio Flood Control Project (PFCP) was authorized by the U.S.-Mexico Boundary Treaty of 1970 and subsequent

2

Congressional ratification for purposes of flood control and to establish an international boundary line. *See* Pub. L. No. 92-549, §§ 101, 102, 201, 202 (Oct. 25, 1972). The U.S. Section of the International Boundary and Water Commission (IBWC)—a binational body responsible for applying the boundary and water treaties between the U.S. and Mexico—commissioned construction of the PFCP in the U.S. in 1975. *See About Us*, U.S. Section IBWC, https://perma.cc/H35W-8M6U; *Environmental Impact Statement* at 1–2. As a federal government agency, the U.S. Section (USIBWC) continues to manage the PFCP. *See* 22 U.S.C. § 277 *et seq.*; *About Us*, USIBWC, https://perma.cc/H35W-8M6U; *Flood Control Levee Systems*, USIBWC, https://perma.cc/589A-AFZN.

The PFCP works by channeling the Rio Grande through berms and earthen levees on both sides to keep the river swell from flooding surrounding land. *Environmental Impact Statement* at 1–2. The average levee height is 12 to 15 feet, though in some areas it exceeds 20 feet. *Id.* at 2. The PFCP also includes two parallel spur levees along the Cibolo Creek, known as the north and south Cibolo Creek levees. *Id.* at ES-2, 1-1. The PFCP provides flood protection to approximately 52 square miles of urban and agricultural land in Presidio. *Flood Control Levee Systems*, USIBWC, https://perma.cc/589A-AFZN.

Second, the U.S. Army Corps of Engineers (USACE) built two additional levees on the Cibolo Creek—the Cibolo Creek left and right levees—in 1982 to further reduce flood damage in Presidio. *See Presidio, TX, Cibolo Creek Left Levee*, USACE, https://perma.cc/3ZAE-NW3U; *Presidio, TX, Cibolo Creek Right Levee*, USACE, https://perma.cc/5AJV-JWBN. Those levees are currently managed by the City of Presidio. *See Presidio, TX, Cibolo Creek Left Levee*, USACE, https://perma.cc/3ZAE-NW3U; *Presidio, TX, Cibolo Creek Right Levee*, USACE, https://perma.cc/5AJV-JWBN.

Together, the PFCP and Cibolo Creek levees provide critical flood control to Presidio and the broader region. But these systems are not failsafe. As the world saw in 2008, heavy rainfall and runoff from Tropical Depression Lowell caused the Rio Conchos to swell, overtopping Mexican reservoirs, breaking levees, and dumping into the Rio Grande just above Presidio. *See 2008 Rio Grande Flood*, Nat'l Park Serv. (Jan. 31, 2009), https://perma.cc/C689-V9BN. The Rio Grande rose from 2–3 feet to, in some places, over 30 feet. *Id.* Lower-lying areas of Presidio were placed under mandatory evacuation, ranch lands and backyards flooded, and trees and power lines were partly submerged as water flowed over the top of the PFCP levee. *See Flooding Turns Texas Town to Mud*, Associated Press (Sept. 18, 2008), https://perma.cc/23A5-E86E. Then-Texas Governor Rick Perry issued a disaster declaration, *Texas Town Races To Thwart Flood Waters*, CBS News, (Sep. 19, 2008), https://perma.cc/RN3X-97YE, and portions of the PFCP had to be rebuilt at costs exceeding $14 million. *See* USIBWC, *Final Environmental Impact Statement, Flood Control Improvements and Partial Levee Relocation, United States Section, International Boundary and Water Commission (USIBWC) Presidio Flood Control Project (FCP), Presidio, TX*, 75 Fed. Reg. 18238, 18238–39 (Apr. 9, 2010); Declaration of John T. Kennedy ("Kennedy Decl.") ¶ 22.

The USACE-built levees also pose flood risks. For example, the USACE warns that the "2.22 square mile[] . . . area behind the [left] levee . . . could potentially flood," which "includes residential and commercial areas with a population of over 2,830 people, 1,113 structures, $201M property value and includes 2 types of critical infrastructure (Fire Station & Law Enforcement)." *Presidio, TX, Cibolo Creek Left Levee*, USACE, https://perma.cc/3ZAE-NW3U.

## II.    Border Wall Construction in Big Bend

Following President Trump's 2025 Inauguration Day direction to "take all appropriate action to deploy and construct temporary and permanent physical barriers to ensure complete

operational control of the southern border of the United States," Exec. Order 14165, *Securing Our Borders*, 90 Fed. Reg. 8467 §§ 2–3 (Jan. 20, 2025); *see also* Presidential Proclamation 10886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327–28 (Jan. 20, 2025) (similar), DHS and CBP renewed construction of a "Smart Wall" along the Southern Border. The "Smart Wall" is "comprised of a steel bollard wall or waterborne barrier, along with roads, detection technology, cameras and lighting and in some cases a secondary wall." *Smart Wall Frequently Asked Questions*, CBP, "What does the Smart Wall (border wall system) include?" (last modified May 21, 2026), https://perma.cc/RN8G-69AL. According to CBP's website, the "Smart Wall" will span the U.S.-Mexico border from San Diego to the Gulf of Mexico, running across Southern California, Arizona, New Mexico, and Texas. *See id.*

### III.    The Big Bend Waivers

Under Section 102(c)(1) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), as amended, the DHS Secretary may "waive all legal requirements" that they "determine[] necessary to ensure expeditious construction of [border] barriers and roads." REAL ID Act of 2005, Pub. L. No. 109-13, § 102(c)(1), 119 Stat. 302, 306 (2005) (codified at 8 U.S.C. § 1103(c)(1) note). Relying on that authority, the Secretary of DHS has repeatedly issued waivers in connection with "Smart Wall" construction along various sectors of the U.S.-Mexico border.[1] The waivers purport to disclaim applicability of a host of legal requirements, including,

---

[1] *See, e.g.*, 90 Fed. Reg. 23946 (June 5, 2025) (Tucson Sector); 90 Fed. Reg. 41589 (Aug. 26, 2025) (Rio Grande Valley Sector); 90 Fed. Reg. 48281 (Oct. 15, 2025) (Tucson Sector); 90 Fed. Reg. 48282 (Oct. 15, 2025) (El Centro Sector); 90 Fed. Reg. 48283 (Oct. 15, 2025) (Del Rio Sector); 90 Fed. Reg. 48284 (Oct. 15, 2025) (Rio Grande Valley Sector); 90 Fed. Reg. 48285 (Oct. 15, 2025) (Yuma Sector); 90 Fed. Reg. 48286 (Oct. 15, 2025) (Big Bend Sector); 90 Fed. Reg. 48287 (Oct. 15, 2025) (Laredo Sector); 90 Fed. Reg. 48288 (Oct. 15, 2025) (El Paso Sector); 90 Fed. Reg. 48289 (Oct. 15, 2025) (San Diego Sector); 91 Fed. Reg. 7297 (Feb. 17, 2026) (Big Bend Sector); 91 Fed. Reg. 27969 (May 15, 2026) (Big Bend Sector); 91 Fed. Reg. 34831 (June 9, 2026) (Big Bend Sector).

depending on the waiver, laws protecting the environment; laws preserving archaeological resources, paleontological resources, antiquities, and Native American remains and cultural items; laws addressing waste disposal and noise control; and laws setting procedures for federal contracting. *See supra* note 1; *infra* notes 2–4.

Multiple of the DHS waivers issued under Section 102(c)(1) apply to Big Bend. On October 15, 2025, then-Secretary of DHS Kristi Noem declared that DHS "will take immediate action to construct additional barriers and roads in the Big Bend Sector," positing that "[t]here is presently an acute and immediate need to construct additional physical barriers and roads in the vicinity of the border of the United States in order to prevent unlawful entries into the United States and achieve and maintain operational control of the border in the Big Bend Sector." 90 Fed. Reg. 48286, 48287 (the "First Waiver"). Secretary Noem thus purported to "waive with respect to all contracting actions necessary for the construction of physical barriers and roads (including, but not limited to, accessing the project areas, creating and using staging areas, the conduct of earthwork, excavation, fill, and site preparation, and installation and upkeep of physical barriers, roads, supporting elements, drainage, erosion controls, safety features, lighting, cameras, and sensors) in the Big Bend Sector" a host of legal and regulatory requirements generally related to government contracting, but also including the APA.[2]

---

[2] These included: "the Administrative Procedure Act (5 U.S.C. 551, *et seq.*); 15 U.S.C. 631(j); 15 U.S.C. 637(d)–(f), and (h)–(k); 15 U.S.C. 644; 15 U.S.C. 657q; 28 U.S.C. 1491(b) (to the extent that it authorizes injunctive relief or any form thereof that would interfere with the expeditious construction of barriers and roads); 31 U.S.C. 3553(c) and (d)(3); 40 U.S.C. 1101 *et seq.*; 41 U.S.C. 1126; 41 U.S.C. 1708(a), (c), (e)–(g); 41 U.S.C. 1901(c), (d), and (e); 41 U.S.C. 3301; 41 U.S.C. 3302(b)–(e); 41 U.S.C. 3304; 41 U.S.C. 3306(a)–(c); 41 U.S.C. 3307(b)– (d), (e)(4), and (e)(5)(C); 41 U.S.C. 3309; 41 U.S.C. 3502; Section 880 of Division A, Title VIII of Public Law 115–232 (41 U.S.C. 3701, Note); 41 U.S.C. 4103(c), (d)(3)–(4); 41 U.S.C. 4104(b); 41 U.S.C. 4105(c)–(d), (f)(2)–(3), (g); 41 U.S.C. 4106(c)–(d); 41 U.S.C. 6101(b)(1); 13 CFR part 125, and 127.503(g); 48 CFR 7.102; 48 CFR part 10; 48 CFR 16.504(c); 48 CFR 16.505(a)(4), (a)(8)(i) and (iii), (a)(9), and (b); 48 CFR 17.207; 48 CFR 22.404–5; 48 CFR subpart 22.5; 48 CFR 28.102–1(c); 48 CFR 33.103(f)." 90 Fed. Reg. 48286, 48287.

On February 17, 2026, Secretary Noem issued a further waiver as to the Big Bend Sector, making similar findings about the "immediate" need "to construct additional barriers and roads in . . . the Big Bend Sector." 91 Fed. Reg. 7297, 7298 ("Second Waiver"). Secretary Noem invoked Section 102(c) to waive "with respect to the construction of physical barriers and roads" numerous additional legal requirements primarily related to the environment, but again including the APA.[3] *See id.*

On May 15, 2026, Secretary Mullin issued another waiver as to the Big Bend Sector, making similar findings about the "immediate" need "to construct additional barriers and roads in . . . the Big Bend Sector." 91 Fed. Reg. at 27969–70 ("Third Waiver"). The Third Waiver purported to waive the same legal requirements as to the same activities as the Second Waiver and further waived a handful of additional laws.[4] On June 9, 2026, Secretary Mullin republished the Third Waiver to correct an erroneous "project area description" contained in the Third Waiver. *See* 91

---

[3] The waiver covered the following: the National Environmental Policy Act; the Endangered Species Act; the Federal Water Pollution Control Act; the National Historic Preservation Act; the Migratory Bird Treaty Act; the Migratory Bird Conservation Act; the Clean Air Act; the Archeological Resources Protection Act; the Paleontological Resources Preservation Act; the Federal Cave Resources Protection Act of 1988; the National Trails System Act; the Safe Drinking Water Act; the Noise Control Act; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act; the Comprehensive Environmental Response, Compensation, and Liability Act; the Archaeological and Historic Preservation Act; the Antiquities Act; the Historic Sites, Buildings, and Antiquities Act; the Eagle Protection Act; the Native American Graves Protection and Repatriation Act; the Administrative Procedure Act; Section 438 of the Energy Independence and Security Act; the National Fish and Wildlife Act of 1956; the Fish and Wildlife Coordination Act; the Farmland Protection Policy Act; the Wild Horse and Burro Act; the Wild and Scenic Rivers Act; and the Federal Land Policy and Management Act. 91 Fed. Reg. 7297, 7298.

[4] These included the Wilderness Act, the National Park Service Organic Act, the National Park Service General Authorities Act, 16 U.S.C. § 156, 16 U.S.C. § 157, 16 U.S.C. § 157c, and 16 U.S.C. § 157d. 91 Fed. Reg. at 27970.

Fed. Reg. at 34831–32 ("Fourth Waiver").[5] None of the four waivers purported to waive any legal requirements of the Rivers and Harbors Act. *See supra* notes 2–4.

### IV.    Construction in the Big Bend Sector

As the waivers portended, DHS and CBP are barreling ahead with their planned construction of the "Smart Wall" in the Big Bend Sector. That includes building "175 miles of primary border barrier in Hudspeth, Jeff Davis, and Presidio counties, Texas" which "will consist of 30-foot-high six-inch-squared diameter steel bollards, spaced approximately four inches apart with anti-climb features." *Border Barrier System– Hudspeth, Jeff Davis, and Presidio Counties, Texas – January 2026*, CBP (last modified May 29, 2026), https://perma.cc/RQ8M-E5HT. CBP is also clearing "[a]djacent areas . . .  to store construction materials and equipment," constructing maintenance and patrol roads, and installing "drainage gates." *Id.*

As to the Presidio levees, in response to inquiries from PMDD, CBP advised on March 30, 2026, that "Smart Wall" construction "will involve constructing a reinforced concrete levee wall adjacent to and matching the height of the current [PFCP] levee, with 30-foot steel bollard panels installed on top." Letter from Paul Enriquez, Director Infrastructure Portfolio Program Management Office Directorate, U.S. Border Patrol, to John T. Kennedy, Executive Director & Registered Agent, PMDD, Compl. Ex. A at 1–2 ("CBP Letter"). CBP similarly informed the U.S. Section of the IBWC that it "plans to construct a concrete levee wall on the river side of the existing earthen levee and place the bollard wall on top of the concrete levee wall," such that "the concrete

---

[5] The waivers are inconsistent in their definition of the Big Bend Sector project area. The Second Waiver applies to the area "[s]tarting at approximately GPS point 31.037623, –105.579877 and extending south and east to approximately GPS point 29.325866, –104.046466." 91 Fed. Reg. at 7298. The Third Waiver applies to the area "[s]tarting at approximately GPS point 29.7275568– 101.6848011 and extending east to approximately GPS point 29.727557–102.684802." *Id.* at 27969. The Fourth Waiver applies to the area "[s]tarting at approximately GPS point 29.325866, -104.046466 and extending east to approximately GPS point 29.728522, -102.683945." *Id.* at 34832. The First Waiver does not provide the coordinates for the area at issue. *See* 90 Fed. Reg. at 48287–88.

wall will replace the slope of the existing levee." Letter from Tony Frye, Deputy Commissioner, Office of the Commissioner, USIBWC, to John T. Kennedy, Executive Director, PMDD (April 30, 2026), Compl. Ex. B at 1 ("IBWC Letter").

Residents of Presidio—including those residing in the immediate vicinity of the levees—received letters in February 2026 notifying them that CBP "may need to enter [their] property for either construction or access purposes." Letter from CBP, *Subject: Notice of Interest—Property Located Near Planned Border Barrier Construction Projects* (Feb. 20, 2026), https://perma.cc/NR24-J3VQ (cited in Mary Cantrell, *Government Documents Reveal Big Bend Border Wall Details as Opposition Grows*, Marfa Pub. Radio (Feb. 27, 2026), https://perma.cc/2LDV-GF2F); Kennedy Decl. ¶ 27. In March 2026, CBP officials represented to local officials that "Smart Wall" construction in that region would commence as soon as June 1. Kennedy Decl. ¶ 28. And more recently, a CBP spokesperson informed the press that installation of the actual border wall panels in the Big Bend Sector, including in the Presidio area, is scheduled to begin in late summer or early fall. Travis Bubenik, *Construction Start Nears for Big Bend Area Border Wall*, Marfa Pub. Radio (June 7, 2026), https://perma.cc/VK3R-TW4B. In preparation for that, CBP represented that it has "obtained voluntary Rights of Entry for Construction (ROE-C) with some landowners" in the Big Bend Sector, which will give "CBP immediate access to private property to complete surveys," conduct "appraisals," and "begin construction activities." *Id.*

As of June 2026, "contracts . . . have been awarded, and the project is in the design phase or early construction activities have begun" across the entire Big Bend Sector. *Smart Wall Map*, CBP (last modified June 10, 2026), https://perma.cc/84PB-3ZQ9. Border wall construction in the Presidio area is being carried out under a $1,223,124,000 contract awarded to Fisher Sand & Gravel Co. ("Fisher"). *See Contract Summary*, USASpending.gov, https://perma.cc/NF9G-J5HJ; CBP Letter at 1 (stating that Fisher was contracted "to construct approximately 68 miles of primary

9

border wall system in [U.S. Border Patrol]'s Presidio Station's Area of Responsibility in Texas"). Fisher's "start date," *i.e.*, when "work begins" or "the award [was] otherwise effective," was March 5, 2026. *See Contract Summary*, USASpending.gov, https://perma.cc/NF9G-J5HJ. And DHS has awarded billions of dollars in contracts in the broader Big Bend Sector, as well.[6]

Indeed, around late April, over 20 Fisher Sand & Gravel Co. trailers arrived in an RV park in Presidio. *See, e.g.*, Rob D'Amico, *Presidio Man Rents RV Slots to Wall Contractors*, The Big Bend Sentinel (May 4, 2026), https://perma.cc/A2RY-2G4A; Kennedy Decl. ¶ 34. Earlier this month, workers for Fisher or their corporate affiliate, Fisher Industries, cleared approximately 14 acres of private land and installed modular offices on a section of the property. Kennedy Decl. ¶ 32. PMDD officials understand that Fisher will be using that property for project offices, materials staging, and equipment storage as part of "Smart Wall" construction. *Id.* ¶ 32. Heavy equipment stamped with "Fisher Industries" is also operating about two miles from the PFCP. *Id.* ¶ 34.

PMDD officials have also been approached by other border-wall contractors or subcontractors seeking to use PMDD-owned land in connection with their work. That includes a February 2026 request from Barnard Construction Company, Inc. to set up a 500-RV camp for border-wall construction workers and a March 2026 request from Big Bend Materials, a local

---

[6] *See, e.g.*, *Barnard Construction Company, Inc., Contract Summary*, USASpending.gov, https://perma.cc/J9JE-MAFM (awarding $1,025,996,158 to Barnard Construction Company, Inc., for border barrier construction monitoring services with March 5, 2026 start date); *Barnard Construction Company, Inc., Contract Summary*, USASpending.gov, https://perma.cc/JKY2-9W4S (awarding another $960,423,540 to Barnard Construction Company, Inc., for border barrier construction with March 5, 2026 start date); *Tierra Right of Way Services Ltd, Contract Summary*, USASpending.gov, https://perma.cc/EX6M-W262 (awarding $4,425,343 to Tierra Right of Way Services Ltd. for border barrier construction monitoring services with April 29, 2026 start date); *Southwest Valley Constructors Co., Contract Summary*, USASpending.gov, https://perma.cc/V6WZ-EZCT (awarding $1,720,040,000 to Southwest Valley Constructors Co. for "construction task order for border wall" with May 11, 2026 start date); *Fisher Sand & Gravel Co., Contract Summary*, USASpending.gov, https://perma.cc/9GPK-ZQ9K (awarding another $2,594,040,000 contract to Fisher for "Border Barrier Design Build" with June 3, 2026 start date).

10

cement company believed to be a Fisher subcontractor, for 15 acres to support wall construction. *Id.* ¶¶ 30–31. Big Bend Materials contacted PMDD again in June 2026 seeking to purchase fill materials from PMDD land for its work. *Id.* ¶ 32.

As of March or April 2026, PMDD officials have observed survey crews operating in the immediate vicinity of the PFCP as well as the movement of heavy equipment, construction and improvement of access roads, and gravel mining in the broader Big Bend Sector. *Id.* ¶ 33.

## V. The Rivers and Harbors Act and the Presidio Levees

The Rivers and Harbors Act (RHA) makes it unlawful, without permission of the Secretary of the Army, to "take possession of or make use of for any purpose, or build upon, alter, deface, destroy, move, injure, obstruct by fastening vessels thereto or otherwise, or in any manner whatever impair the usefulness of any. . . levee . . . or other work built by the United States, . . . in whole or in part, for the preservation and improvement of any of its navigable waters or to prevent floods, or as boundary marks, . . . []or remove for ballast or other purposes any stone or other material composing such works." 33 U.S.C. § 408(a).

According to a May 11, 2026 letter from the USACE to PMDD in response to an inquiry about "Smart Wall" construction, USACE had "informally" contacted CBP "to discuss their process," but "[t]o date, the [USACE] has not been formally engaged by DHS, CBP, or any contractor regarding proposed construction on or adjacent to the Presidio Flood Control Project." Letter from Matthew T. Miller, P.E., PMP, Lieutenant Colonel, U.S. Army District Commander, to John T. Kennedy, Executive Director & Registered Agent, PMDD (May 11, 2026), Compl. Ex. C at 1 ("USACE Letter"); Kennedy Decl. ¶ 56. USACE further advised that the Cibolo Creek left and right levees, are "USACE-constructed levees," and that "if proposed construction intersects" with those levees, it "would necessitate permission under Section 14 of the Rivers and Harbors Act of 1899 (33 U.S.C. § 408)." USACE Letter at 1. As of the date of this filing, the USACE's

11

Section 408 database does not list any Section 408 requests related to the "Smart Wall" and the levees. *See USACE Regulatory and Section 408 Publicly Available Data*, USACE, https://perma.cc/VV7C-KQ99.

## VI.    Harms to Presidio and PMDD

The risks posed by CBP's alterations to Presidio's levee system are both intuitive and severe. Replacing the earthen PFCP levee wall with a new concrete levee wall with 30-foot bollard panels on top would fundamentally alter the flow of water through the Rio Grande. Kennedy Decl. ¶¶ 43–44. Those changes could undermine the levee's structural integrity, including leaving it more vulnerable to erosion, leakage, high-water levels, levee failure, and flash flooding, particularly during the periods of extreme wind and storms that are common in Big Bend. *Id.* ¶¶ 44, 47. Indeed, due to its location downstream of the Chinati Mountains, through which the Cibolo Creek flows, the City is already under threat of flash flooding. *Id.* ¶ 47. Changes to the PFCP levee that raise water levels or obstruct flow can also push water up the Cibolo Creek, preventing the Creek from draining into the Rio Grande and increasing pressure on the hydraulically connected Cibolo Creek left and right levees. *Id.* ¶ 45. This can undermine those levees' integrity, such as by causing the levees to overflow and experience damage from sediment and debris in fast-moving and high-pressure waters. *Id.* ¶ 46.

CBP's choice of contractor for the segment of the wall in the Presidio area, Fisher, only exacerbates the hazards of construction. In 2019, the Department of Justice sued Fisher and its affiliate, Fisher Industries, for building a private border fence along the Rio Grande without an adequate hydraulic analysis. *See United States v. We Build the Wall, Inc. et al.*, No. 19-cv-00403, Dkt. No. 68, ¶¶ 14, 16–28 (S.D. Tex. Aug. 25, 2021). According to the Department of Justice, the Fisher entities' poor construction led to substantial erosion under the bollard fence, threatening the fence's integrity and degrading the riverbank. *Id.* ¶¶ 34–36. *See* Perla Trevizo and Jeremy

12

Schwartz, *Settlement Reached Over Private Border Wall, but Experts Say It Won't Stop the Environmental Damage*, Tex. Trib. (June 4, 2022), https://perma.cc/MDD3-LMSJ (discussing case settlement).

Experts who have analyzed CBP's border wall projects along other portions of the Rio Grande have raised similar concerns about safety and integrity. One geoscientist who has "regularly coordinated with the United States Border Patrol" recently analyzed the impact of CBP's "Smart Wall" about 100 miles upstream of Presidio. Letter from R.S. Johnson, Magnet Geological (May 6, 2026), Kennedy Decl. Ex. C at 1 ("Johnson Letter"); Kennedy Decl. ¶ 50. According to his analysis, a "border wall placed" in "extreme flash-flood terrain" near the Rio Grande "would behave as a hydraulic obstruction." Johnson Letter at 1. During periods of intense rainfall, "openings" on the wall "c[ould] plug quickly" with "sediment and debris." *Id.* Water would "pond[] behind the barrier," increasing pressure and accelerating erosion. *Id.* at 1. The end result would be "structural failure." *Id.* at 2. The risk is not of a remote, once-in-a-lifetime event: "[W]ashouts and damage could occur several times in a single year." *Id.*

A geomorphologist reached a similar conclusion with respect to "Smart Wall" construction on a separate segment of the Rio Grande in Texas. Mark Tompkins, *Expert Analysis of Proposed Border Wall and Buoy System on the Rio Grande River in Webb and Zapata Counties, Texas, USA* (Mar. 10, 2026), Kennedy Decl. Ex. D ("Tompkins Report"); Kennedy Decl. ¶ 51. According to Dr. Tompkins, "[p]ortions of the proposed wall" will "fail during extreme high flows," leading to "catastrophic flooding, damage and destruction to property, and risks to the health and safety of people near the river corridor." Tompkins Report at 14.

A failure of Presidio's levees would have devastating consequences. The levees protect the entire City of Presidio and its residents, and flooding would threaten lives, homes, businesses, and infrastructure. Kennedy Decl. ¶ 59. That includes hundreds of millions of dollars worth of

property, thousands of structures, and law enforcement infrastructure. *Id*. Flooding driven by levee failure could damage highways and railroads that connect the City to urban centers to the north, isolating it from the rest of the United States. *Id*. ¶ 61. Critical utility infrastructure would be threatened: the 2008 flood damaged wastewater treatment facilities, causing water quality problems in the Rio Grande. *Id*. The economic effects could be severe as well. Presidio contains the Presidio-Ojinaga Port of Entry, a major regional border crossing that accounted for approximately $387.5 million in trade in 2023. *Id*. ¶ 60. A disruption in port operations caused by flooding could have significant effects on both sides of the border. *Id*.

Flooding caused by levee failure would also threaten PMDD's main asset, the Presidio Industrial Park—approximately 400 acres of land located less than one mile away from the PFCP levee and behind one of the USACE-built Cibolo Creek levees. *Id*. ¶ 12. PMDD has leased out portions of the park for activities such as geothermal drilling—a lease worth approximately $10 million to PMDD over its full term—and transferred property to a home manufacturing company as part of a full-time job creation agreement. *Id*. ¶¶ 12–13. It is also developing other areas of the park for uses such as greenhouses, agricultural-processing facilities, data centers, and light manufacturing. *Id*. ¶ 13. Flooding driven by CBP's alterations to the levee system could damage or destroy these assets. *Id*. ¶ 59.

Even assuming no flooding occurs, the mere increase in flood risk and uncertainty driven by CBP's levee alterations is frustrating PMDD's efforts to develop the Industrial Park, causing it financial harm. *Id*. ¶ 65. Developers are well aware of the risk of flooding in the region and are sensitive to the effects of the "Smart Wall." *Id*. In their negotiations and conversations with PMDD, developers have repeatedly asked about what "barrier construction [will] do to flood performance." *Id*. ¶ 68. For example, the geothermal developer with a lease in the Industrial Park subsequently

14

"raised questions . . . about how barrier construction activities might affect stormwater management." *Id.* ¶ 65. A prospective data center developer "raised questions with [PMDD] about flood risk" and "whether flooding could disrupt the reliability of the utilities . . . that a data center needs to operate without interruption." *Id.* ¶ 66. But without the confirmation of a Section 408 permit, PMDD cannot provide adequate assurances to these developers about the risks of investing in the area. *Id.* ¶¶ 68–69. "The resulting uncertainty is being priced into every pending negotiation to which PMDD is a party," and "Smart Wall" development is "constrain[ing]" PMDD's ability to bring in investment. *Id.* ¶ 68. Indeed, beyond flood-related concerns, the "presence" of "Smart Wall" construction alone dampens developers' opinions of the "character and stability" of Presidio. *Id.* ¶ 69. "Combined with the unanswered questions about flood performance," the effect of the "Smart Wall" on developers' perceptions "is making it materially harder for PMDD to position the Industrial Park as a stable, attractive location for the long-term investment it is designed to support." *Id.*

PMDD has also taken costly steps to mitigate the harms caused by Defendants' decision to move forward with the "Smart Wall" without a Section 408 permit. Already, PMDD has been forced to retain an architectural and engineering firm to conduct a flood-risk and regulatory assessment, including an analysis of flood risks caused by CBP's construction on the Presidio levees. *Id.* ¶ 62. The first phase of that assessment cost PMDD nearly $15,000, and it expects subsequent phases to be even more costly. *Id.* PMDD staff have also devoted significant time and resources to contacting federal agencies to understand and respond to CBP's plans for the border wall. *Id.* ¶ 63.

Separately, "Smart Wall" construction is also damaging PMDD's property. Without obtaining authorization from PMDD, federal contractors operating next to the Presidio Industrial Park recently used heavy equipment to clear five acres of PMDD-owned land. *Id.* ¶ 70.

## LEGAL STANDARD

Section 705 of the APA authorizes a court reviewing an agency action to "issue all necessary and appropriate process to postpone the effective date of [the] agency action or to preserve status or rights pending conclusion of the review proceedings" "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. Similarly, courts may issue a preliminary injunction under their equitable powers to "maintain a status quo" or "preserve the relative positions of the parties," pending further proceedings on the merits. *Sherley v. Sebelius*, 689 F.3d 776, 781–82 (D.C. Cir. 2012) (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). To obtain either form of relief, a plaintiff must establish "that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest." *E.g. Dist. of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) (citing *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008)).

## ARGUMENT

### I.    Plaintiff is Likely to Succeed on the Merits

PMDD is likely to succeed on the merits of its claim. The Big Bend Sector construction violates the Rivers and Harbors Act by interfering with the Presidio levees without USACE permission. This violation means that Defendants' actions are contrary to law under the APA, a cause of action that is not a "legal requirement" and thus not waivable under IIRIRA. In the alternative, Defendants' "Smart Wall" construction without a Section 408 permit constitutes *ultra vires* action.

16

## A.  Big Bend Sector Construction Violates the Rivers and Harbors Act

DHS's construction of the Big Bend Sector, and specifically its decision to augment the PFCP levee system, is contrary to the Rivers and Harbors Act. As explained above, the RHA declares it unlawful to:

> to take possession of or make use of for any purpose, or build upon, alter, deface, destroy, move, injure, obstruct by fastening vessels thereto or otherwise, or in any manner whatever impair the usefulness of any. . . levee . . . or other work built by the United States, . . . in whole or in part, for the preservation and improvement of any of its navigable waters or to prevent floods, or as boundary marks, . . . []or remove for ballast or other purposes any stone or other material composing such works.

33 U.S.C. § 408(a). The only exceptions to Section 408 are (1) if for "temporary occupation or use," "the Secretary of the Army . . . on the recommendation of the Chief of Engineers, grant[s] permission . . . when in his judgment such occupation or use will not be injurious to the public interest; or (2) if for "alteration or permanent occupation or use," "the Secretary . . . on the recommendation of the Chief of Engineers, grant[s] permission . . . when in the judgment of the Secretary such occupation or use will not be injurious to the public interest and will not impair the usefulness of such work." *Id.*

CBP's construction of a new concrete border wall with bollards atop to replace the existing earthen levee wall in the PFCP plainly requires Army authorization. Such activity "build[s] upon," "alter[s]," and "move[s]" the PFCP levee. *Id.* Building a concrete wall in the levee can also "injure, obstruct" and/or "impair the usefulness of," *id.*, the PFCP because, as described *supra* at 12, it can increase erosion, leakage, and undermine the integrity of the levee itself. And while CBP has not shared what it plans to do to with the existing levee wall, its decision to supplant that wall is likely to involve "destroy[ing]" portions of the levee or "remov[ing] . . . material composing such works." 33 U.S.C. § 408(a).

Moreover, because the Cibolo Creek levees are hydraulically connected to the PFCP,

17

construction on the PFCP levee system is also expected to "alter," "obstruct," and/or "impair the usefulness of," *id.*, the Cibolo Creek left and right levees. Kennedy Decl. ¶¶ 45–46; *supra* at 12 (explaining that alterations to the PFCP can increase the risk of erosion, damage to, and failure of the left and right Cibolo Creek levees).

Defendants' construction in the Big Bend Sector without permission of the Army thus violates the RHA.

### B. Plaintiff May Properly Bring Suit Under the APA

Because Defendants are acting in violation of the RHA, their actions are likewise "not in accordance with law" under the APA. *See* 5 U.S.C. § 706(2)(A). And as described below, Defendants' conduct is actionable under the APA because there has been a final agency action and because any waiver of the APA's legal requirements does not extend to a mere cause of action that imposes no independent legal requirements on DHS.

### 1. Construction of the Big Bend Sector of the Border Wall Constitutes Final Agency Action

The APA "provides a right to judicial review of all 'final agency action for which there is no other adequate remedy in a court.'" *Bennett v. Spear*, 520 U.S. 154, 175 (1997) (quoting 5 U.S.C. § 704). The term "[agency] action" covers "comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). For agency action to be "final," it must (1) "mark the 'consummation' of the agency's decisionmaking process" and (2) "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 177–78 (first quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948); then quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). The decision to construct a "Smart Wall" in the Big Bend Sector constitutes final agency action that this court may review.

18

Extensive evidence demonstrates that DHS and CBP have made a final decision to build a border wall in the Big Bend Sector. *See Bennett*, 520 U.S. at 177–78. DHS has repeatedly declared in its Section 102(c)(1) waivers that it "*will take immediate action* to construct additional barriers and roads in the Big Bend Sector." 90 Fed. Reg. 48286, 48287 (emphasis added); *see also* 91 Fed. Reg. at 7297 (similar); *id.* at 27969 (similar). DHS has also awarded contracts for the construction of the wall throughout the Big Bend Sector. *See, e.g.*, *Smart Wall Map*, CBP (last modified June 10, 2026), https://perma.cc/84PB-3ZQ9.

That the agencies have reached a final decision is further demonstrated by the fact that they are already carrying it out. *See Sw. Airlines Co. v. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016) (holding that "the way the agency subsequently treats the challenged action" is evidence of finality). As described *supra*, contractors have set up camp in an RV park in Presidio, have approached PMDD officials about leasing land and purchasing materials for the purposes of construction, and are actively clearing land and building offices. Kennedy Decl. ¶¶ 29–32, 34. Survey crews are operating around the PFCP, and, elsewhere in Big Bend, contractors are mobilizing heavy equipment, constructing and improving access roads, and mining gravel. *Id.* ¶ 33. CBP officials themselves represented that work would commence in the Big Bend Sector around June 1, *id.* ¶ 28, and, more recently, that installation of the actual border wall panels, including in the Presidio area, will begin in late summer or early fall. *Supra* at 9.

DHS and CBP's decision also carries substantial legal and practical consequences and will determine the rights of third parties. *See Bennett*, 520 U.S. at 178. Pursuant to its decision, Defendants have already entered into massive construction contracts and obtained Rights of Entry for Construction. *Supra* at 9–10. The construction that flows from this decision will also significantly impair the rights of border communities and municipalities like PMDD. *See supra* at 12–16.

Thus, the agencies' decision to build a Big Bend border wall is "final agency action" subject to APA review.

### 2. The IIRIRA Waiver Does Not Apply to an APA Contrary to Law Cause of Action or Section 705 Relief

Section 102 permits the Secretary of Homeland Security to waive "all legal requirements" that they "determine [are] necessary to ensure expeditious construction of the barriers and roads." 8 U.S.C. § 1103(c)(1) note. Although the Secretary has purported to waive the legal requirements imposed by the APA, the waivers do not—and could not—erase this court's authority to review Defendants' action for "accordance with law" under 5 U.S.C. § 706(2)(A) and to issue appropriate relief.

In interpreting statutory language, courts first consider "whether the language at issue has a plain and unambiguous meaning." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). Where the language is "unambiguous" and "the statutory scheme is coherent and consistent," courts do not resort beyond the plain language. *Id.*

The term "legal requirements" is unambiguous. The primary definition of "Legal" is "Of, relating to, or involving law generally; falling within the province of law." LEGAL, Black's Law Dictionary (12th ed. 2024). The primary definition of "requirement" means "[s]omething that must be done because of a law or rule; something legally imposed, called for, or demanded; an imperative command." REQUIREMENT, Black's Law Dictionary (12th ed. 2024). Other definitions include "The act of establishing something as a need or necessity; a demand." *Id.* Putting these together, laws that demand, command, or impose obligations are "legal requirements."

The contrary to law provision of 5 U.S.C. § 706(2)(A) imposes no legal requirements on agencies. Rather, it empowers courts to "hold unlawful and set aside agency action . . . found to

20

be . . . not in accordance with law." The duty to follow the "law" derives not from the APA, but from the separate, substantive statutory provision that an agency is alleged to have violated. Section 706(2)(A)'s contrary to law provision merely provides the cause of action to challenge a violation of that separate legal requirement. *Cf. SAI v. Dep't of Homeland Sec.*, 149 F. Supp. 3d 99, 115 (D.D.C. 2015) (recognizing that "the APA provides a cause of action to challenge final agency action that is not in accordance with the Rehabilitation Act").

To be sure, some other provisions of the APA impose legal requirements on agencies. For example, 5 U.S.C. § 552 legally requires agencies to publish certain rules in the Federal Register. Section 553 further imposes legal requirements around proposed rulemakings: agencies must generally publish in the Federal Register notices of proposed rulemaking and allow for public participation through comment. But those other APA provisions are different than 5 U.S.C. § 706(2)(A)'s contrary to law provision because they impose duties on agencies that are independent of other statutory requirements.

Applying that distinction here, the prohibition on Defendants interfering with the Presidio levees without U.S. Army approval stems from the RHA, not the APA. The APA merely provides Plaintiff with a cause of action to challenge Defendants' violation of the RHA and this Court with the power to issue relief for that substantive violation of the RHA. Similarly, 5 U.S.C. § 705 imposes no legal requirements on Defendants. It speaks only to this Court's powers to "postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings" "as may be required and to the extent necessary to prevent irreparable injury." *Id.*

For these reasons, Plaintiff's contrary to law cause of action is not covered by DHS's waiver of the APA and this Court maintains power to issue a Section 705 stay.

21

### C. Alternatively, Failure to Comply with the RHA is *Ultra Vires*

"Review for *ultra vires* acts rests on the longstanding principle that if an agency action is 'unauthorized by the statute under which [the agency] assumes to act,' the agency has 'violate[d] the law' and 'the courts generally have jurisdiction to grant relief.'" *Nat'l Ass'n of Postal Supervisors v. United States Postal Serv.*, 26 F.4th 960, 970 (D.C. Cir. 2022) (alterations in original) (quoting *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902)). As such, *ultra vires* review is available if (1) "there is no express statutory preclusion of all judicial review," (2) "there is no alternative procedure for review of the statutory claim," and (3) "the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Fed. Express Corp. v. United States Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (citations omitted).

Nothing in the RHA precludes judicial review. Nor were the statute's legal requirements waived by DHS with regard to the Big Bend Sector. Moreover, and as described above, Defendants have acted in excess of their delegated powers and contrary to a specific, clear, and mandatory prohibition in the RHA by interfering with the Presidio levees without permission from the Secretary of the Army. *See supra* § I.A. And if this Court were to reject Plaintiff's theory of liability under the APA's contrary to law cause of action, there would be "no alternative procedure for review," *Fed. Express Corp.*, 39 F.4th at 763 (quotation omitted). As such, if the Court were to reach Plaintiff's alternative *ultra vires* claim, it would likely succeed.

## II. The Big Bend Construction is Likely to Irreparably Harm Plaintiff

To obtain preliminary relief, a plaintiff must show that "irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Here, construction of the wall in the Big Bend Sector is likely to impose irreparable harms on PMDD.

22

CBP's construction plans for Presidio would work a massive conversion of the levee system protecting Presidio and place the City in jeopardy of severe flood damage. The new levee wall will have different dimensions and be made of a different material than the current earthen wall. And while changes of this magnitude would typically involve a substantial engineering review, Kennedy Decl. ¶ 48, CBP has not engaged USACE's assessment through the Section 408 process. These untested changes could dramatically heighten the flood risk facing Presidio and PMDD by raising water levels and compromising the PFCP and Cibolo Creek levees' integrity, placing the City in jeopardy of levee failure and flash floods. *See supra* at 12–13.

Floods stemming from Defendants' "Smart Wall" border construction would harm PMDD, including by destroying or damaging its Industrial Park and PMDD's significant investments therein—including physical improvements like road construction. *See* Kennedy Decl. ¶ 14. And even if no flooding actually occurs, the heightened risk alone is damaging PMDD's ability to make economic use of the land. *See supra* at 14–15.

Furthermore, PMDD is having to expend its own resources to mitigate against the risks caused by Defendants' action. PMDD has already spent significant funds on an outside expert to assess flood risk stemming from the "Smart Wall," and it will need to finance additional phases of that assessment as construction continues. *See supra* at 15.

These injuries are irreparable. Given the imminent construction and its overlap with monsoon season, *see* Kennedy Decl. ¶ 16, it is very possible that Defendants' construction could cause flooding before this court can issue permanent relief. By the time this case reaches final judgment, Defendants will likely have completed construction of the "Smart Wall" in Presidio. *See, e.g.*, *Fisher Sand & Gravel Co. Contract Summary*, USASpending.gov, https://perma.cc/NF9G-J5HJ (setting "end date" for Fisher's construction as September 5, 2027).

23

Even assuming this court has the authority to order Defendants to restore the original PFCP levee wall—a claim Defendants are almost certain to contest—an injunction at that point would provide limited relief. It would also present significant legal and practical complexities and potentially require years of additional construction, including because DHS's waivers of regulatory requirements may not extend to this work.

Nor is there a realistic prospect that PMDD could recover damages based on the harm caused by "Smart Wall" construction in the interim. The government would almost certainly assert sovereign immunity and various other defenses for any claims of economic damage—including for costs of flood damage, mitigation expenses, and diminished property values—and any path to recovery would face a steep uphill climb. In these circumstances, the financial harm identified by PMDD is irreparable. *See, e.g.*, *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 178 (D.D.C. 2025) (holding that, where "plaintiff's monetary damages" are "unrecoverable," financial harm is "sufficient to establish irreparable harm" and collecting cases), *appeal filed* No. 25-5241 (D.C. Cir.).

Accordingly, awarding preliminary relief is likely the only means of ensuring that PMDD's interests will be protected against Defendants' illegal actions.

## III.    The Balance of Equities and the Public Interest Favors a Stay

"[W]hen the Government is the opposing party," the last two interim relief factors—"harm to the opposing party" and "the public interest"—"merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "A party's likelihood of success on the merits 'is a strong indicator that a preliminary injunction would serve the public interest' because '[t]here is generally no public interest in the perpetuation of unlawful agency action." *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (alteration in original) (quoting *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)); *see also C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) ("It

24

is well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" (quoting *Open Cmtys. Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017))). Because, as explained above, Plaintiff has established a strong likelihood that Defendants illegally flouted a statutory obligation, the remaining factors point strongly in favor of preliminary relief.

Furthermore, any harm to Defendants is far outweighed by the harm to PMDD and the public that could occur from a flood event. While Defendants might claim harm from being unable to continue building their "Smart Wall," those alleged harms are particularly minimal in the Big Bend Sector, where undocumented border crossings are relatively few due to rough terrain and the lack of surrounding roads. *See* Kennedy Decl. ¶ 24; Rachel Monroe, *The Looming Disaster of the Border Wall in Big Bend, Texas*, The New Yorker (May 14, 2026), https://perma.cc/NKX8-W7AX. Indeed, even though the Big Bend Sector encompasses nearly one-quarter of the entire southwest border, *see Big Bend Sector Texas*, "Overview," CBP (last modified Aug. 6, 2025), https://perma.cc/5TS4-E2ZV, in FY 2025, it accounted for only about 1% of all U.S. Border Patrol apprehensions—just 3,096 out of a total of 254,183—and apprehensions in the sector have plummeted by 74% compared to two years ago. *See Illegal Border Crossings in Big Bend Sector Fall Significantly in FY 2025*, CBP (Dec. 5, 2025), https://perma.cc/2KAT-9LFX; *CBP Enforcement Statistics*, CBP (last updated May 19, 2026), https://perma.cc/P3XW-8UGW. Defendants would also be free to continue their non-"Smart Wall" border security tactics, which they themselves tout as effective in preventing undocumented crossings. *See Illegal Border Crossings in Big Bend Sector Fall Significantly in FY 2025*, CBP, https://perma.cc/2KAT-9LFX.

Given that balance, the public interest overwhelmingly favors staying construction of the border wall through the pendency of this litigation.

25

**CONCLUSION**

For all of these reasons, Plaintiff has made a showing of an entitlement to preliminary relief.

Dated: June 17, 2026                    Respectfully submitted,

                                        */s/ Louis Katz*
                                        Louis Katz (DC Bar No. 90003861)
                                        Laura Bakst (DC Bar No. 1782054)*
                                        Brian Netter (DC Bar No. 979362)
                                        Skye L. Perryman (DC Bar No. 984573)
                                        **DEMOCRACY FORWARD FOUNDATION**
                                        P.O. Box 34553
                                        Washington, DC 20043
                                        Phone: (202) 448-9090
                                        lkatz@democracyforward.org
                                        lbakst@democracyforward.org
                                        bnetter@democracyforward.org
                                        sperryman@democracyforward.org

                                        *Counsel for Plaintiff*

                                        * Motion to appear *pro hac vice* forthcoming