## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PRESIDIO MUNICIPAL DEVELOPMENT DISTRICT,<br><br>          Plaintiff<br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security,<br><br>U.S. CUSTOMS AND BORDER PROTECTION,<br><br>RODNEY S. SCOTT, in his official capacity as Commissioner for Customs and Border Protection,<br><br>          Defendants. | Case No. 26-cv-2146 |

**DECLARATION OF JOHN T. KENNEDY**

I, John T. Kennedy, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.      I am the Executive Director and Registered Agent of the Presidio Municipal Development District ("PMDD"), a political subdivision of the State of Texas established by local election on November 6, 2012, pursuant to Chapter 377 of the Texas Local Government Code. I was appointed Executive Director of PMDD in December 2024. I submit this declaration in my official capacity. The facts stated herein are based on my personal knowledge, my review of PMDD records maintained in the ordinary course of business, and identified public sources.

### I.    My Experience and Background

1

2.      Prior to my appointment as Executive Director of PMDD, I worked as a survey party chief for more than five years, managing professional land survey operations throughout the Trans-Pecos Big Bend region. That included hydrographic surveying of the Rio Grande in support of the U.S. Geological Survey's Grand Canyon Monitoring and Research Center and boundary surveys for Big Bend National Park boundary expansion. I hold a Texas Land Surveyor in Training certification (#110857).

3.      Prior to that, I served in federal infrastructure policy roles in Washington, D.C. From 2015 to 2016, I served as Director of the Mid-Atlantic Gateway at the U.S. Department of Transportation's (DOT) Maritime Administration, where I represented the Department on the Mid-Atlantic Regional Planning Body and led intermodal freight and port infrastructure planning.

4.      From 2010 to 2015, I served as a Senior Policy Analyst and Presidential Management Fellow in the Office of the Secretary at DOT, where I led high-profile discretionary infrastructure programs, including the TIGER Grant Program and High-Speed Rail initiative, as well as served as policy lead for performance-based metropolitan and statewide transportation planning reform. From 2012 to 2013, I also served as Transportation and Infrastructure Policy Advisor on the White House Domestic Policy Council, where I advised the President on transportation, infrastructure, and urban affairs policy; led development of transportation and housing policy with the DOT and the U.S. Department of Housing and Urban Development; and designed and managed federal interagency and multijurisdictional technical assistance initiatives across two dozen federal agencies.

5.      I have also served as a Geospatial Analyst at the Coastal Resources Division of the Texas General Land Office in 2007; as a Transportation Planner and Policy Analyst at the

Capital Area Metropolitan Planning Organization in Austin, Texas, from 2008 to 2010; as the Vice President, Mobility, for the Downtown Austin Alliance in 2017;  and as a Water/Wastewater Operator and Environmental Compliance Officer for the City of Alpine, Texas, in 2018 to 2019.

6.     I have a Master of Public Affairs (University Honors) and a Master of Science in Community and Regional Planning from the University of Texas at Austin, in addition to bachelor's degrees in liberal arts (government) and journalism from the University of Texas at Austin.

## II.     Background on PMDD and Presidio

7.     PMDD's mission is to promote economic development in the Presidio area through infrastructure investment, industrial development, cross-border commerce, and community revitalization. PMDD is primarily funded by sales-and-use tax revenues.

8.     In my capacity as Executive Director of PMDD, I am responsible for all aspects of PMDD's operations, including asset management, infrastructure planning, intergovernmental relations, and economic development strategy.

9.     PMDD's service area encompasses the City of Presidio, its extraterritorial jurisdiction (covering an area within one mile of the city limits), and adjacent areas of Presidio County where the district's economic development activities have direct impact.

10.     The City of Presidio is an incorporated municipality in Presidio County, Texas, situated on the Rio Grande near the U.S.-Mexico border. Presidio has a population of approximately 4,000 people. Presidio County, along with Brewster and Jeff Davis Counties, comprise the Big Bend region—a remote area of the Chihuahua Desert in Southwest Texas located within the bend of the Rio Grande.

11.     To give just a couple examples of the PMDD's work, PMDD is currently coordinating with the City of Presidio in obtaining and administering grants from the Texas Department of Agriculture's Community Development Block Grant program. PMDD is currently coordinating a $1 million Downtown Plaza grant and is applying for another grant to fund a downtown amphitheater.

12.     PMDD also owns the Presidio Industrial Park, located in and adjacent to the City of Presidio. The Park is less than one mile from the Presidio Flood Control Project and behind the Cibolo Creek right levee, which, as described in the following section, protect the area from flooding. The park is PMDD's primary economic-development asset. PMDD currently holds approximately 400 acres of that property. In the past, PMDD has sold parcels of the Presidio Industrial Park to support economic growth in PMDD. For instance, PMDD has conveyed a parcel to a home-manufacturing operation under an economic-development agreement tied to full-time job creation in the region.

13.     PMDD's current policy is to lease rather than sell Industrial Park property. In September 2025, for example, PMDD leased a 42-acre parcel of the Presidio Industrial Park to Exceed Geo Energy, a geothermal energy developer, to develop power supply in Presidio. I have calculated the net present value of that 40-year ground lease and corresponding power-purchase agreement to be approximately $10 million. PMDD is developing other land in the Industrial Park for intended uses such as greenhouses, cold storage, agricultural processing, data centers, and light manufacturing.

14.     PMDD has invested, and continues to invest, in developing the Presidio Industrial Park. For example, in November 2025, PMDD committed and has since expended $100,000 in cost-share funding to support pre-development of the geothermal project at the park. Those funds

went toward site development and related activities, including physical improvements like road construction, as well as studies and permitting. PMDD is working towards building out the park fully over time.

**III.    The Presidio Levees and Flood Risks in the Area**

15.    Presidio is located at the confluence of multiple tributaries to the Rio Grande. Presidio is just 2 miles downstream of where the Rio Conchos, a large tributary, enters the Rio Grande. The Cibolo Creek, another large tributary, meets the Rio Grande just north of Presidio. And another tributary, the Alamito Creek, also joins the Rio Grande in Presidio County.

16.    Because of this geography, Presidio and the surrounding community face serious flood risks. Those risks are particularly heightened in June through September—"monsoon season"—given increases in rainfall during those months.

17.    To manage these risks, Presidio houses a complex flood control plan. That includes the Presidio Flood Control Project (PFCP), which was created by the U.S.-Mexico Boundary Treaty of 1970 and federal law to manage flood control and set an international boundary between the United States and Mexico. The project is managed by the International Boundary and Water Commission (IBWC), a joint body of the United States and Mexico.

18.    The portion of the PFCP in the United States is managed by the U.S. Section of the IBWC. It is my understanding that the U.S. Section is a federal agency and was responsible for commissioning construction of the U.S.-portions of the PFCP in or about 1975.

19.    The PFCP uses berms and levees to channel the Rio Grande and prevent it from overflowing into the surrounding lands. The PFCP levee extends approximately 15 miles through Presidio, Texas, and varies in height from 12 to over 20 feet. It also includes two parallel levees on the Cibolo Creek, which are known as the north and south Cibolo Creek levees.

20.　　　To further protect Presidio and the broader area from flooding, the U.S. Army Corps of Engineers constructed two additional levees on the Cibolo Creek in or about 1982. Those levees, called the right and left Cibolo Creek Levees, are currently operated by Presidio County. Many homes lie behind the Cibolo Creek levees.

21.　　　The importance of these levee systems cannot be overstated. They protect Presidio and the surrounding community from potentially devastating flooding when storms and water run off cause the Rio Grande and its tributaries to swell. At times of heavy rainfall, the Rio Grande in the region has risen from 2-3 feet deep to over 30 feet deep.

22.　　　That is exactly what occurred in 2008, when heavy rainfall from a tropical depression compromised the flood control system in the Mexico and the United States, resulting in a state of emergency, mandatory evacuation orders, and severe flooding in Presidio. Due to extremely high water levels in the Rio Conchos, the tributary broke Mexican levees and dumped huge amounts of water into the Rio Grande just above Presidio. The PFCP levees experienced breaches, overtopping (when water flows above the levees), and seepage (when water flows away from the river channel and escapes below or through the levee). The repair costs exceeded $14 million and the replacement value of the system is nearly $100 million.

23.　　　However, the post-2008 construction only served to restore the levee to its original protection levels. The PFCP is thus built to withstand a 25-year flood event (i.e. a flood with a 1/25 risk of occurring in a given year). By contrast, Federal Emergency Management Agency (FEMA) considers property within a 100-year flood event plain (i.e. a flood with a 1/100 risk of occurring in a given year) to be "high-risk" and requires flood insurance for those properties with federally backed mortgages.  The right and left Cibolo Creek levees have also experienced significant wear.

**IV.    Construction of the "Smart Wall" in Presidio**

24.    It is my understanding that the Department of Homeland Security and Customs and Border Protection are constructing a border wall along the southern border, including through Big Bend and in Presidio. It is my understanding that apprehensions for undocumented crossings in the Big Bend area are some of the lowest along the Southern border, and that those numbers have continued to decrease in recent years.

25.    In early 2026, it started becoming clear to PMDD that border wall construction was proceeding in Presidio.

26.    For example, in January 2026, CBP's website indicated that it was "planning to construct border barrier system to Hudspeth, Jeff Davis, and Presidio counties, Texas," that "will consist of 30-foot-high six-inch-squared diameter steel bollards, spaced approximately four inches apart with anti-climb features," as well as elements such as construction of maintenance and patrol roads and installation of drainage gates. *Border Barrier System– Hudspeth, Jeff Davis, and Presidio Counties, Texas – January 2026*, CBP (last modified May 29, 2026), https://perma.cc/RQ8M-E5HT. CBP also stated that "[a]djacent areas will be cleared and used to store construction materials and equipment." *Id.*

27.    In or about February 2026, Presidio area landowners received "Right of Entry" correspondence from CBP, referencing temporary access, acquisition of property interests, and potential eminent domain proceedings related to border-wall construction. Those recipients included multiple landowners whose property is in the immediate vicinity of the PFCP. Around the same time, the U.S. Army Corps of Engineers, Fort Worth District, also began engaging property owners in the Presidio area regarding acquisition of land related to border-wall construction.

28.     The following month, in March 2026, CBP held a meeting with local elected officials. I was informed by attendees at that meeting, and through media reporting, that CBP represented that border wall construction in Presidio and the broader Big Bend region would begin as soon as June 1.

29.     In my capacity as Executive Director of PMDD, I have been repeatedly approached by border-wall contractors or subcontractors seeking to use PMDD's Industrial Park land for construction-related activities.

30.     Specifically, around early February 2026, Barnard Construction Company, Inc., requested to lease or buy PMDD land for a 500-RV "man camp" to house border-wall construction workers. PMDD denied that request because it would be inconsistent with the planned use for the Industrial Park.

31.     In March 2026, Big Bend Materials, a local cement factory, sought to lease approximately 15 acres of Presidio Industrial Park land in connection with border-wall construction. On April 1, 2026, PMDD likewise took no action on that request. It is my understanding that Big Bend Materials is a subcontractor of Fisher Sand & Gravel Co., a company that has been awarded multiple contracts by DHS.

32.     Big Bend Materials and Fisher Sand & Gravel Co. are now using approximately 14 acres of private property directly adjacent to PMDD's Presidio Industrial Park to support wall construction. In June of this year, workers who I understand to be from Fisher Sand & Gravel Co. and/or from Fisher Industries, an entity I understand to be a corporate affiliate of Fisher Sand & Gravel Co., cleared the entire parcel of land using heavy equipment and began installing modular offices. It is my understanding that the land will be used for Fisher's project offices, for materials staging, and equipment storage as part of border-wall construction. Big Bend Materials

8

also approached me again in June 2026 seeking to dig up clay from the Industrial Park for use as fill material in their work.

33.	I have also witnessed construction mobilization in Presidio and the broader Big Bend Region. I have witnessed movement of heavy equipment, construction and improvement of access roads, establishment of staging areas, and gravel mining elsewhere in Big Bend. I have also personally seen survey crews operating, both aerially and on land, in the immediate vicinity of the PFCP since March or April 2026.

34.	Around late-April 2026, over 20 Fisher Sand & Gravel Co. trailers were placed in the Loma Paloma RV park in Presidio. *See, e.g.*, Rob D'Amico, *Presidio man rents RV slots to wall contractors*, The Big Bend Sentinel (May 4, 2026), https://perma.cc/U2XU-ZJSV. This week, I witnessed heavy equipment and conveyor belts with Fisher Industries markings on them operating about 2 miles from the PFCP.

V.	**PMDD's Information Gathering Efforts Regarding Construction of the Border Wall**

35.	As it became clear that border wall construction was impending in Presidio, the PMDD issued a March 4, 2026 resolution titled "A RESOLUTION ACKNOWLEDGING THE FEBRUARY 17, 2026 DHS WAIVER DETERMINATION; AFFIRMING THE DISTRICT'S ECONOMIC DEVELOPMENT AND INFRASTRUCTURE MISSION; DOCUMENTING ANTICIPATED INFRASTRUCTURE INTERFERENCE AND COMPENSABLE IMPACTS; AND PRESERVING ALL AVAILABLE RIGHTS AND REMEDIES." A true and correct copy of that resolution is attached hereto as Exhibit A.

36.	Included in that resolution was a determination that PMDD "shall continue to evaluate and document anticipated interference with, impairment of, or constraint upon designated infrastructure planning and reliance interests arising from construction activity,

9

corridor designation, or associated federal real estate actions," and "pursue appropriate intergovernmental coordination and information requests necessary to assess infrastructure compatibility and treaty-adjacent impacts." Ex. A at 2–3.

37.     Consistent with that mandate, I, on behalf of PMDD, have repeatedly sought to coordinate with, and to obtain information about border-wall construction from, federal government agencies.

38.     For example, on or about March 17, 2026, I sent letters to the U.S. Section of the IBWC, the U.S. Army Corps of Engineers, and CBP seeking information about the construction, including how it would impact the Presidio levees and what related engineering analyses and coordination had occurred. In response to those inquiries, I received the following:

39.     An undated letter received on or about March 30, 2026, from CBP's Program Management Office Directorate, U.S. Border Patrol. A true and correct copy of that letter is attached to the Complaint as Exhibit A.

40.     An April 30, 2026 letter from the Office of the Commissioner, United States Section, IBWC. A true and correct copy of that letter is attached to the Complaint as Exhibit B.

41.     A May 11, 2026 letter from the Department of the Army, U.S. Army Corps of Engineers, Albuquerque District. A true and correct copy of that letter is attached to the Complaint as Exhibit C.

42.     On April 6, 2026, I submitted a public comment letter to CBP in response to its solicitation for "public input on the potential impacts to the environment, culture, and commerce, including potential socioeconomic impacts, and quality of life" for its "planned . . . construction and maintenance of approximately[] 175 miles of primary border barrier in Hudspeth, Jeff Davis, and Presidio counties, Texas." *Border Barrier System– Hudspeth, Jeff Davis, and Presidio*

*Counties, Texas – January 2026*, CBP, https://perma.cc/RQ8M-E5HT. A true and correct copy of that comment letter is attached hereto as Exhibit B.

## VI.    Border Wall Impacts on Presidio's Levees and Safety Problems

43.    Based on the letters I received from CBP and the U.S. Section of IBWC, I have learned that CBP is constructing its border wall through the PFCP levee. Specifically, CBP is set to replace the current sloped, earthen levee wall on the Rio Grande with a border wall made of concrete and with 30-foot steel bollard panels installed on top of it. Compl. Ex. A at 1–2; Compl. Ex. B at 1.

44.    Replacing a levee wall could seriously undermine the integrity of a levee system, leaving the surrounding land at risk of deadly flash flooding capable of destroying infrastructure, homes, farmland, and agriculture. For example, replacing the earthen levee slope of the PFCP with a rigid concrete structure and thirty-foot steel bollard panels would materially alter the PFCP's hydraulic performance and structural behavior during flood events. That can include its flow conveyance and floodway capacity; flow velocities; scour and undermining at the levee toe and foundation; debris catchment and blockage; under-seepage and piping through the levee's loose sand-and-gravel foundation; and the dead-load, lateral-load, and overall weight distribution imposed on an embankment not designed to carry a concrete structure.

45.    That can also impact the integrity of the left and right Cibolo Creek levee system, which is hydraulically connected to the PFCP. Construction on the Rio Grande levee that reduces flood conveyance, raises water-surface elevations, or obstructs flow at the Cibolo confluence can produce backwater that propagates upstream into the reach protected by the Cibolo Creek left and right levees, raising water-surface elevations there. In other words, when the Rio Grande runs high, *e.g.* when due to storms or obstructions, it can act like a plug at the mouth of the Cibolo Creek, causing water to back up behind the Cibolo Creek levees too. That risk is

particularly high during a coincident Rio Grande and Cibolo Creek flood of the kind experienced in 2008, when little advance warning is available.

46.     Increased water pressure behind the Cibolo Creek left and right levees could also impair or obstruct those systems. It can cause, for instance, more erosion and damage to the levees as turbulent waters carry and trap sediment and debris. It also risks overtopping if the levees cannot contain the raised water-surface elevation.

47.     The region's geography and environment worsen these risks. Presidio is located downstream of the Chinati Mountains. The Cibolo Creek cuts through the Chinati Mountains and flows down to Presidio. Water and sediment runoff from the mountains toward Presidio can cause flash flooding and damage to flood-control projects. Presidio also experiences extreme wind events, heavy storms, and is located within a seismically active geologic zone.

48.     Based on my professional experience in infrastructure policy, operation, and management, including direct experience with federal infrastructure programs, flood-control systems, and water/wastewater operations, a project of this magnitude would typically undergo a substantial engineering review, including a hydraulic and/or hydrologic assessment.

49.     In fact, I am aware of multiple experts who have raised concerns about DHS and CBP's border-wall construction and the potential harm that it could cause if conducted without a proper engineering analysis.

50.     R.S. "Bud" Johnson, a Texas Licensed Professional Geoscientist, issued a May 6, 2026 "Technical Opinion Regarding Long-Term Border Wall Durability in Flash-Flood Terrain Downstream of the Viejo Mountains, Southwest Texas." A true and correct copy of that letter is attached hereto as Exhibit C. In that letter, Mr. Johnson opines that "a conventional continuous border wall is not a durable long-term structure . . . unless it is designed as a highly specialized

12

flood-conveyance and debris-passage system" due to the high-risk of flash flooding in many areas downstream of the Viejo Mountains." Ex. C at 1. Mr. Johnson further opined that a border wall "would remain vulnerable because floodwater in this environment carries sediment and debris," can "commonly [cause] foundation scour, wall undermining, lateral bypass erosion, and eventual structural failure," and that "repeated failure should be expected." *Id*. at 1–2. As a result, Mr. Johnson stressed the importance of "detailed site specific geologic, geomorphic, hydrologic, and hydraulic evaluation." *Id*. at 3. While Mr. Johnson's analysis focused on an area of Big Bend upstream of Presidio that gets run off from Sierra Vieja, Presidio experiences similar terrain and flood effects given its location below the Chinati Mountains.

51.     Dr. Mark Tompkins, P.E., Ph.D., of FlowWest, a fluvial geomorphologist commissioned by the Rio Grande International Study Center, released a March 10, 2026 report regarding border wall construction in Webb and Zapata, counties that are further downstream of Presidio on the Rio Grande. A true and correct copy of that report is attached hereto as Exhibit D. While that report assessed a plan by CBP to conduct a "border and waterborne barrier system" in and adjacent to the Rio Grande, rather than a levee wall, Ex. D at 1, it likewise raises concerns about whether and to what extent DHS and CBP are ensuring their construction does not compromise flood control. Dr. Tompkins concluded that, based on the limited information available about CBP's plan, "it is inevitable that . . . portions of the wall will fail," *id*. at 10, and "cause catastrophic flooding, damage and destruction to property, and risks to the health and safety of people near the river corridor," *id*. at 14. He also stated that "constructing the proposed system without publicly documenting its design and incorporating appropriate risk mitigation measures violates the basic professional standard of care that must be met for projects with such high risks." *Id*.

13

52.     Due to the risk that border wall construction on the PFCP could impair the Presidio levees and leave the region vulnerable to catastrophic flash floods that could destroy infrastructure, homes, farmland, and agriculture and undermine the regional economy, PMDD has made repeated attempts to obtain information about what, if any, concrete efforts CBP and DHS have taken to ensure that construction will not undermine the safety or efficacy of the Presidio levees. Unfortunately, those outreach efforts have not quelled concerns.

53.     On April 30, 2026, I sent a further correspondence to CBP seeking, among other things: "[t]he hydraulic and hydrologic analysis demonstrating that the proposed reinforced concrete border-barrier wall and thirty-foot steel bollard installation, as designed, can be constructed and maintained on and adjacent to the Presidio Valley Flood Control Project without diminishing the levee's design conveyance, compromising its structural integrity, or altering flows within the Rio Grande floodplain" and "the geomorphic and sediment-transport analysis." A true and correct copy of that letter is attached hereto as Exhibit E.

54.     I received an email response on May 28, 2026, from CBP's Program Management Office Directorate, U.S. Border Patrol. A true and correct copy of that email is attached hereto as Exhibit F. In that email, CBP claimed that the "engineering documents [PMDD] requested are not shared with the public . . . to protect sensitive information and national security." *Id.* at 1.

55.     I also learned from the U.S. Section of the IBWC that "[t]ypically, project proponents such as CBP develop and submit hydraulic models for USIBWC's review, when the proposed structures are located within the Rio Grande floodplain" to allow "[t]he USIBWC [to] evaluate[] the submittals for impacts on the structural integrity of the levees and facilities," among other things. Compl. Ex. B at 1–2. The U.S. Section advised that CBP has kept it

"informed of its plans" but "[t]he USIBWC has not yet received any designs for review for border barrier segments within the Big Bend Sector[.]" *Id*. at 2.

56.     I also learned from the USACE that it "typically would be involved in an engineering review if proposed construction intersects with USACE-constructed levees," but that USACE "has not been formally engaged by DHS, CBP, or any contractor regarding proposed construction on or adjacent to the Presidio Flood Control Project." Compl. Ex. C at 1.

57.     It is my understanding that construction implicating the Presidio levees would require authorization by USACE under Section 408 of the Rivers and Harbors Act. Based on the response from USACE, it is my understanding that no Section 408 request has been submitted or approved by DHS, CBP, or any contractor thereof.

58.     My understanding is that the Section 408 process would include a technical analysis that would assess whether and to what extent the border-wall construction would impact the levees, their structural integrity, flood conveyance, and/or flood-fighting abilities. It is also my understanding that the Section 408 process typically allows impacted entities to provide input on projects seeking Section 408 authorization. Had PMDD had that opportunity, it would have voiced its concerns about the border wall's impact on the Presidio levees and PMDD.

## VII.    Harms to PMDD

59.     Flooding in the region of the PFCP and Cibolo Creek levees would cause huge devastation in the Presidio area. The entire City of Presidio sits behind the PFCP and Cibolo Creek levees. The PFCP alone protects approximately 5,403 acres of land. As the USACE has documented, the areas behind the Cibolo Creek left levee alone include more than 2,830 people, 1,113 structures, and approximately $201 million in property value. *See Presidio, TX, Cibolo Creek Left Levee*, U.S. Army Corps of Eng'rs, https://perma.cc/9BVK-D3KL. That includes

critical infrastructure, like a fire station and law enforcement facilities. *Id.* The right levee protects additional structures and property, including the Presidio Industrial Park. Based on my professional experience and my knowledge of the area, a failure of those levees would place the whole community—its residents, homes, businesses, agricultural operations, public infrastructure, and international commerce—at risk of catastrophic flooding.

60.     The flood risk extends to internationally significant infrastructure. Presidio is home to the Presidio-Ojinaga Port of Entry, one of the region's principal commercial border crossings. In 2023, trade through the port totaled approximately $387.5 million across its top commodities, including live animals, machinery and parts, vehicles, edible fruit and nuts, and articles of iron and steel. The port supports key sectors of the local and regional economy, including agriculture and cross-border trade, livestock, and manufacturing. If a flood were to disable port operations, it would have substantial binational economic consequences.

61.     Presidio also depends on transportation and utility lifelines that are likewise located behind the levees. U.S. Highway 67 is the only highway connecting Presidio to urban areas in the United States to the north. That highway crosses Cibolo Creek. The railroad and other highways serving the region also cross the floodplain. A levee failure could sever these connections and isolate the community. The City's water and wastewater facilities, situated within the protected area, would also be exposed; during the 2008 flood, wastewater treatment facilities in the binational region were compromised and flooded, affecting water quality in the Rio Grande.

62.     Because of the lack of a Section 408 process and consistent with PMDD's mission of promoting economic development and community improvement in Presidio, PMDD has been forced to commission, at its own expense, an architectural and engineering firm, Parkhill, to

16

conduct a flood-risk and regulatory assessment, including an assessment of CBP's construction on the levees' integrity. The cost of the first phase of that assessment was nearly $15,000, and I expect that future phases could approach six figures.

63.    PMDD has also been forced to expend significant staff time and resources contacting federal government entities, as described above, and making information requests.

64.    These unexpected costs were not budgeted for and have forced PMDD to divert its limited resources that would have been used for other purposes consistent with its mission.

65.    The border-wall construction also harms PMDD's core economic-development mission and its proprietary and financial interests. PMDD's principal asset is the Presidio Industrial Park, which is located less than a mile from the PFCP. PMDD is seeking to develop the park by leasing out land to businesses. Given the location of the park, prospective developers are sensitive to the risk of flooding, including flooding due to the construction of CBP's border wall. The construction of the border wall, and the uncertainty surrounding its potential effects on flood risk and drainage at the Industrial Park, is changing how prospective lessees evaluate the park and the surrounding area. In the summer of 2025, as PMDD was negotiating its geothermal lease with Exceed Geo Energy, the developer raised due diligence questions regarding site control and flood risk. PMDD's lease agreement with Exceed contains provisions addressing flood risk and related contingencies. In the spring of 2026, after the announcement of border-wall construction in the Presidio area, the developer raised additional questions with me about how barrier construction activities might affect stormwater management. These questions are significant because flood risk over the 40-year lease term must be accounted for in the project's financing and insurance, and an increase in flood risk raises the cost to the lessee.

17

66.    In June 2026, a data center developer considering development in Presidio Industrial Park raised questions with me about flood risk and specifically whether flooding could disrupt the reliability of the utilities (such as power, telecommunications, natural gas and water) that a data center needs to operate without interruption. Because CBP has not obtained a Section 408 permit, I cannot give the developer the assurances their diligence requires.

67.    Similar problems are occurring outside of the Industrial Park, too. PMDD has been engaged with a hotel developer regarding potential development in Presidio on City property. PMDD was tasked by the Presidio City Council with leading the development of the property, including soliciting developers and putting together an incentive agreement as part of a downtown revitalization initiative. In March 2026, the hotel developer indicated to me that its market studies now need to account for the potential chilling effect of border barrier construction on the regional tourism economy, and that financing requires enhanced due diligence around floodplain status.

68.    In my conversations with developers across multiple industries, the same two questions recur: What will barrier construction do to flood performance and drainage at this site, and when will anyone be able to say? Because the border construction has not complied with the Section 408 process, PMDD is limited in its ability to give assurances to developers about flood risk in the Industrial Park and the broader City. The resulting uncertainty is being priced into every pending negotiation to which PMDD is a party. This constrains PMDD's ability to attract and plan investment.

69.    The presence of intensive border-wall construction activity in the immediate vicinity of the Industrial Park is also altering how prospective developers perceive the area as a place to invest. Developers evaluate not only flood risk but also the character and stability of the

surrounding environment, and the introduction of large-scale construction activity, staging, and associated operations adjacent to the park is changing that calculus. Combined with the unanswered questions about flood performance, this is making it materially harder for PMDD to position the Industrial Park as a stable, attractive location for the long-term investment it is designed to support. Without the assurances of the Section 408 process, PMDD's ability to move prospective development forward will remain constrained.

70.    In addition to the economic harms to PMDD's real estate, the border-wall construction has also caused damage to its land. The contractors from Fisher working on the parcel of land adjacent to PMDD's Industrial Park apparently failed to conduct a survey before beginning work and have cleared approximately 5 acres of PMDD land without consent.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge. Executed this 17th day of June 2026.

_____
John T. Kennedy

19