**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PRESIDIO MUNICIPAL DEVELOPMENT DISTRICT,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; U.S. CUSTOMS AND BORDER PROTECTION; and RODNEY S. SCOTT, in his official capacity as Commissioner for Customs and Border Protection,<br><br>　　　　　Defendants. | **Case No. 26-cv-2146** |

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A STAY
UNDER 5 U.S.C. § 705 AND/OR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

ARGUMENT .....................................................................................................................2

    I.     PMDD IS LIKELY TO SUCCEED ON THE MERITS BECAUSE
          SECTION 408(A) WAS NOT AND CANNOT BE WAIVED ...............................2

    II.    PMDD IS SUFFERING IRREPARABLE HARM .................................................7

    III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR
          RELIEF ..............................................................................................................14

    IV.   RELIEF AGAINST THE AGENCY ACTION IS APPROPRIATE ....................17

CONCLUSION..................................................................................................................18

i

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Biden v. Nebraska*,
600 U.S. 477 (2023)..................................................................................................... 6

*In re Carvalho*,
598 B.R. 356 (D.D.C. 2019) ......................................................................................... 7

*Cipollone v. Liggett Grp., Inc.*,
505 U.S. 504 (1992)....................................................................................................... 4

*Ctr. for Biological Diversity*,
404 F. Supp. 3d 218 (D.D.C. 2019) ............................................................................. 7

*CTS Corp. v. EPA*,
759 F.3d 52 (D.C. Cir. 2014) ....................................................................................... 7

*Learning Res., Inc. v. Trump*,
607 U.S. 229 (2026)....................................................................................................... 4

*Lovitky v. Trump*,
949 F.3d 753 (D.C. Cir. 2020) ..................................................................................... 5

*Make the Rd. N.Y. v. Noem*,
No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025)................................... 17, 18

*N. Am. Butterfly Ass'n v. Wolf*,
977 F.3d 1244 (D.C. Cir. 2020) ................................................................................ 3, 7

*Roberts v. Sea-Land Servs., Inc.*,
566 U.S. 93 (2012)......................................................................................................... 4

*Shawnee Tribe v. Mnuchin*,
984 F.3d 94 (D.C. Cir. 2021) ..................................................................................... 14

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)................................................................................................... 1, 17

*Utility Air Regulatory Group v. EPA*,
573 U.S. 302 (2014)....................................................................................................... 6

*West Virginia v. EPA*,
597 U.S. 697 (2022)....................................................................................................... 6

**FEDERAL STATUTES**

15 U.S.C. § 1334.................................................................................................. 3, 4

15 U.S.C. § 1681t.................................................................................................. 4

16 U.S.C. § 1536.................................................................................................. 2

18 U.S.C. § 201 .................................................................................................... 5

22 U.S.C. § 7422.................................................................................................. 3

31 U.S.C. § 1341.................................................................................................. 5

31 U.S.C. § 1350.................................................................................................. 5

*33 U.S.C. § 408................................................................................................ *passim*

33 U.S.C. § 1368.................................................................................................. 4

42 U.S.C. § 300gg-134 ........................................................................................ 3

42 U.S.C. § 1320d-5 ............................................................................................ 4

42 U.S.C. § 2000d................................................................................................ 5

42 U.S.C. § 2000e-2............................................................................................. 5

42 U.S.C. § 4332.................................................................................................. 2, 3

42 U.S.C. § 4846.................................................................................................. 3

42 U.S.C. § 6926.................................................................................................. 3

42 U.S.C. § 6992d................................................................................................ 3

42 U.S.C. § 7413.................................................................................................. 3

52 U.S.C. § 20511................................................................................................ 5

*REAL ID Act of 2005, Pub. L. No. 109-13, sec. 102, § 102(c)(1), 119 Stat. 302, 306
    (2005) (codified at 8 U.S.C. § 1103 note)................................................................ *passim*

**FEDERAL REGULATIONS**

Determination Pursuant to Section 102 of the Illegal Immigration Reform and
    Immigrant Responsibility Act of 1996, as Amended, 91 Fed. Reg. 40550 (July
    2, 2026) ................................................................................................ 1, 8, 18

Determination Pursuant to Section 102 of the Illegal Immigration Reform and
    Immigrant Responsibility Act of 1996, as Amended, 90 Fed. Reg. 48286 (Oct.
    15, 2025) ......................................................................................................... 17

Determination Pursuant to Section 102 of the Illegal Immigration Reform and
    Immigrant Responsibility Act of 1996, as Amended, 91 Fed. Reg. 7297 (Feb.
    17, 2026) ......................................................................................................... 18

**OTHER AUTHORITIES**

Dep't of the Army, *Portland District: Section 408 Overview and Needed Documents
    for Review*, USACE, https://perma.cc/ECR8-C9ZJ (last accessed July 10,
    2026) ................................................................................................................ 13

*DHS Announces Steps to Protect Border Communities from Wall Construction*, DHS
    (Apr. 30, 2021), https://perma.cc/WT4C-Y4RM.............................................. 11

*Drug Seizure Statistics*, CBP (June 18, 2026), https://perma.cc/7V63-4HKW ............................ 16

E-mail from Senior Attorney, Office of Chief Counsel, Trade and Finance, CBP, to
    Rebecca Rizzuti, Deputy Chief Counsel, U.S. Section of IBWC (Apr. 1,
    2026), https://perma.cc/N22U-F4EX................................................................. 9

GAO-23-105443, *Southwest Border: Additional Actions Needed to Address Cultural
    and Natural Resource Impacts from Barrier Construction*, Gov't Account.
    Off. (Sep. 5, 2023), https://perma.cc/WAV8-UJAT .......................................... 12

*Illegal Border Crossings in Big Bend Sector Fall Significantly in FY 2025*, CBP (Dec.
    5, 2025), https://perma.cc/2KAT-9LFX ..................................................... 15, 16

Letter from Members of Congress to Secretary Mullin (Mar. 27, 2026),
    https://perma.cc/ZM6E-ZNXW ....................................................................... 11

Letter from Members of Congress to Secretary Mullin (June 16, 2026),
    https://perma.cc/2CCG-XHBR ..................................................... 10, 11, 14, 15

MacKenzie Elmer, *Environment Report: EPA Maps Reveal Flood Impact from
    Border Wall*, Voice of San Diego (Apr. 24, 2023), https://perma.cc/6STU-
    GVUA .............................................................................................................. 11

MacKenzie Elmer, *Mexico Said River Border Wall Broke Treaties. The US Built it Anyway*, Voice of San Diego (Feb. 11, 2025), https://perma.cc/H9EF-5C22 ............ 11, 14

Mary Cantrell, *Trump admin responds to border wall lawsuit by waiving a law at the center of the case*, Marfa Pub. Radio (July 8, 2026), https://perma.cc/B5AM-39FE ................................................................................... 9

*Nationwide Encounters*, CBP (Jun 18, 2026), https://perma.cc/F3DB-BU5Q ............................ 15

Naveena Sadasivam, The Texas-Mexico Border Wall Comes with a Dangerous, Costly Side Effect: Flooding, Texas Observer (Aug. 17, 2018), https://perma.cc/TGA6-QE4H ...................................................................... 12, 13

PROHIBITION, Black's Law Dictionary (12th ed. 2024) ............................................................. 3

R.D. Alles, Acting Under Sec'y for Mgmt., *Border Security Status Report: First Quarter, Fiscal Year 2022*, DHS (Nov. 2, 2022), https://perma.cc/8NY6-CLZZ ..................................................................................... 15

REQUIREMENT, Black's Law Dictionary (12th ed. 2024) ......................................................... 2

## INTRODUCTION

The government's sole merits argument rests on the fact that, on the date its opposition brief was due, DHS released an amended waiver that purports to waive the Rivers and Harbors Act of 1899. *See* Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 91 Fed. Reg. 40550, 40551 (July 2, 2026) ("July 2 Waiver"). But DHS's belated waiver does not, and could not, relieve Defendants of their obligation to comply with Section 408(a). Congress routinely delineates between "legal requirements" and "prohibitions," and has made it clear that DHS can only waive the former. Section 408(a), by contrast, is a "prohibition"; it says what shall *not* be done, not what shall. And if the plain text of the statute were not enough to establish this, the canon against absurdity and major questions doctrine do. If Defendants were right, DHS could assert an unreviewable power to waive any criminal or civil law with some loose connection to border construction, including laws forbidding bribery, discrimination, and even violence, turning the border into a law-free zone—a result Congress surely did not intend.

Defendants' arguments on the remaining preliminary injunction factors fare no better. Defendants overlook numerous irreparable harms that Plaintiff PMDD is already experiencing, and the government's own actions and representations underscore that construction on the levee is likely imminent and poses an intolerable risk of flooding. Defendants also do not dispute that the illegality of their actions is enough to resolve the balance of the equities and the public interest in PMDD's favor, and their statistical evidence confirms that existing efforts are effective at securing the border. Finally, Defendants incorrectly claim that *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), bears on the scope of relief. This Court can and should stay or enjoin the agency action that Plaintiff is challenging: Defendants' decision to build a "Smart Wall" in the Big Bend Sector.

1

**ARGUMENT**

## I. PMDD IS LIKELY TO SUCCEED ON THE MERITS BECAUSE SECTION 408(A) WAS NOT AND CANNOT BE WAIVED

The government does not meaningfully contest that, but for its post-suit waiver of the Rivers and Harbors Act, PMDD would succeed in showing that Defendants' decision to construct a "Smart Wall" in Big Bend contravenes Section 408(a), or that PMDD may challenge that illegal decision under the Administrative Procedure Act and as *ultra vires*. Rather, Defendants' entire likelihood-of-success argument rests on a single claim: that DHS's mid-litigation waiver excuses its obligation to comply with Section 408(a). This claim is wrong. Section 408(a) is not waivable under Section 102(c)(1) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, because it is not a "legal requirement" within the meaning of the statute.

While Section 102(c)(1)'s waiver authority is undoubtedly broad, it is not limitless. It allows the DHS Secretary to waive "all legal requirements" deemed "necessary to ensure expeditious construction" of barriers and roads on the border. REAL ID Act of 2005, Pub. L. No. 109-13, sec. 102, § 102(c)(1), 119 Stat. 302, 306 (2005) (codified at 8 U.S.C. § 1103 note). But it does not apply to all laws—only to "legal requirements." A "requirement" is "[s]omething that *must be done* because of a law or rule; something legally imposed, called for, or demanded; an imperative command." Pl.'s Mem. 20 (quoting REQUIREMENT, Black's Law Dictionary (12th ed. 2024)) (emphasis added). Two examples of "legal requirements" are Section 7(a) of the Endangered Species Act, 16 U.S.C. § 1536(a)(2), and Section 102(2)(c) of the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C), each of which requires that agencies "shall" take specific actions. *See* 16 U.S.C. § 1536(a)(2) ("[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior or the Secretary of Commerce,] insure that" any agency action "is not likely to jeopardize endangered or threatened species"); 42 U.S.C.

2

§ 4332(2)(C) ("all agencies of the Federal Government shall" prepare environmental impact statements). Consistent with that, the D.C. Circuit has assumed that each of those laws is waivable under Section 102(c)(1). *See N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1262 (D.C. Cir. 2020).

Section 408(a), by contrast, is not a "legal requirement." As its subsection header makes clear, it is a legal "[p]rohibition[]," 33 U.S.C. § 408(a)—a "law or order that *forbids* a certain action." PROHIBITION, Black's Law Dictionary (12th ed. 2024) (emphasis added). Section 408(a) says that "[i]t shall not be lawful" to "build upon, alter, . . . or in any manner whatever impair the usefulness of any . . . levee . . . built by the United States" without permission from the Secretary of the Army. A prohibition like this is the very opposite of a requirement: It says what must *not* be done, not what must.

Applying basic principles of statutory interpretation, Section 102(c)(1) cannot be extended to cover "prohibitions" in addition to "requirements." Where Congress means to address each type of law, it explicitly mentions them both. *See, e.g.*, 22 U.S.C. § 7422(a) ("The President is authorized to waive the prohibitions and requirements of section 7424 of this title [concerning U.S. involvement in United Nations peacekeeping operations] for a single period of 1 year."); 15 U.S.C. § 1334(b) ("No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes" labeled in conformity with federal law).[1] As the Supreme Court has recognized with respect to one such law, by using both

---

[1] *See also, e.g.,* 42 U.S.C. § 7413(a)(1)(A) ("[T]he [EPA] Administrator may . . . issue an order requiring [a] person to comply with the requirements or prohibitions" of a State Implementation Plan under the Clean Air Act); *id.* § 6992d(a)(1) ("Whenever . . . the [EPA] Administrator determines that any person has violated . . . any requirement or prohibition in effect under this subchapter," they may issue compliance orders or commence a civil action); *id.* § 300gg-134(c) (Specified sections "shall not be construed to supersede any provision of State law which establishes, implements, or continues in effect any requirement or prohibition except to the extent that such requirement or prohibition prevents the application of a requirement or prohibition of such a section."); *id.* § 4846 ("[I]t is the intent of the Congress to supersede any and all laws of the States" that "provide for a requirement, prohibition, or standard relating to the lead content in paints or other similar surface-coating materials which differs from the provisions of this chapter or regulations issued pursuant to this chapter."); *id.* § 6926 ("[T]he state may enter into an agreement with the Administrator [of EPA] under which the State may assist in the administration of the requirements and prohibitions

3

terms, Congress covers both "affirmative *requirements* [and] negative *prohibitions*." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 522–23 (1992) (plurality opinion) (holding that 15 U.S.C. § 1334(b), which preempts state "requirement[s] [and] prohibition[s]," prevents states from imposing liability for both "omissions" and "acts"); *see also id.* at 539 (Blackmun, J., concurring in part and dissenting in part) (explaining that, by adding the word "prohibition" to the word "requirement," Congress "ensure[d] that a State could not do through negative mandate . . . that which it already was forbidden to do through positive mandate"). This "[c]ongressional practice" of listing legal requirements and prohibitions "separately and expressly" is "strong evidence" that Congress did not allow DHS to waive legal prohibitions in Section 102(c)(1). *Learning Res., Inc. v. Trump*, 607 U.S. 229, 249–50 (2026) (refusing to read "regulate" to include taxation where Congress addressed the two concepts separately in other statutes).

Indeed, if Congress wanted the waiver authority to cover all laws, it could simply have authorized DHS to waive "any other provision of law"—the exact phrase it used just a dozen words earlier in Section 102(c)(1).[2] The fact that Congress chose different language confirms that "legal requirements" carries a narrower meaning. *See Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 102 n.5 (2012) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." (citation omitted)).

---

which take effect pursuant to [the Hazardous and Solid Waste Amendments of 1984]"); *id.* § 1320d-5(a)(3) (setting amounts "with respect to a violation by a person of a provision of this part," including caps on "the total amount imposed on the person for all such violations of an identical requirement or prohibition during a calendar year"); 15 U.S.C. § 1681t(b) ("No requirement or prohibition may be imposed under the laws of any State" with respect to certain issues relating to consumer credit reports); 33 U.S.C. § 1368(f)(1) ("No certification by a contractor, and no contract clause, may be required in the case of a contract for the acquisition of commercial products or commercial services in order to implement a prohibition or requirement of this section or a prohibition or requirement issued in the implementation of this section.").

[2] Section 102(c)(1) provides: "Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements . . . ." REAL ID Act, sec. 102, § 102(c)(1).

Allowing the Department to waive legal prohibitions would lead to absurd and dangerous results that Congress could not possibly have intended. *See, e.g.*, *Lovitky v. Trump*, 949 F.3d 753, 760 (D.C. Cir. 2020) ("canon against producing absurd results" applies where "statutory outcome . . . defies rationality by rendering a statute nonsensical or superfluous or if it creates an outcome so contrary to perceived social values that Congress could not have intended it" (citations omitted)). DHS could claim to insulate federal officials and contractors from criminal restrictions on bribery, *see, e.g.*, 18 U.S.C. § 201, enabling graft and corruption. It could claim to waive anti-discrimination prohibitions, *see, e.g.*, 42 U.S.C. §§ 2000d, 2000e-2, and fund contractors who engage in pernicious race discrimination. If Congress decided against funding the "Smart Wall," DHS could simply claim to waive the Antideficiency Act—which prohibits federal officers and employees from making obligations in excess of congressional appropriations, 31 U.S.C. §§ 1341(a), 1350—and then contract to build it in defiance of appropriators' contrary decision. And if candidates for political office threatened DHS's border security plans, DHS could even claim to waive prohibitions on election interference, *see, e.g.*, 52 U.S.C. § 20511, to facilitate illegal meddling in their elections.

Moreover, because the waiver provision is not limited to federal legal requirements, under the government's interpretation state and local prohibitions could be set aside, too. DHS could thus claim to immunize federal workers and contractors from state traffic and trespass laws, giving them carte blanche to trample through border communities like Presidio. So too could DHS claim to wipe away assault and homicide prohibitions, allowing the Secretary to wield Section 102(c)(1) waivers to encourage violence against anti-wall protesters.

True, Section 102(c)(1) requires a finding that waiver is "necessary to ensure expeditious construction" of border barriers and roads. But because any determination of necessity under

Section 102(c)(1) is left to the "Secretary's sole discretion," opponents would likely have little ability to challenge waivers of legal prohibitions as unrelated to border security. In effect, the Secretary would have virtually unreviewable discretion to hand out a limitless supply of get-out-of-jail-free cards—an unthinkable result that could turn the border region into a law-free zone.

Were there any uncertainty about whether Section 102(c) stretches so far, the major questions doctrine requires that the answer be no. For reasons of both "separation of powers" and "legislative intent," courts are "reluctant to read into ambiguous statutory text" "extraordinary" delegations of congressional authority. *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quoting *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014)). The government proposes to compound the already-broad reach of the waiver authority to cover an additional category of laws—legal prohibitions—that Congress conspicuously failed to mention. The Supreme Court has previously invoked the major questions doctrine to reject an agency's claim to possess the "virtually unlimited power to rewrite the Education Act"—just *one* statute. *Biden v. Nebraska*, 600 U.S. 477, 502 (2023). Here, DHS claims the authority to rewrite *countless* legal prohibitions across the U.S. Code—and many more administrative rules and state and local laws—without limit. To conclude that Congress intended to give away so much lawmaking authority would require a "clear statement to that effect," *id.* at 506, not just a "plausible textual basis," *West Virginia*, 597 U.S. at 723. As explained, DHS lacks even that.

Finally, while Defendants mistakenly believe the issuance of the waiver defeats PMDD's claim on the merits, they notably do not contend that the waiver affects this Court's jurisdiction. *Cf.* REAL ID Act, sec. 102, § 102(c)(2)(A) (limiting jurisdiction for "claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to [the waiver authority]" to those "alleging a violation of the Constitution"). And for good reason.

6

PMDD's claims challenge the decision to construct a "Smart Wall" in Big Bend in violation of Section 408(a), not the July 2 Waiver, which did not even exist at the time PMDD filed its complaint. Under these circumstances, where the claims "predate and do not depend" on any waiver, they do not "originate" or "aris[e] from" the waiver, and Section 102(c)(2) poses no barrier to judicial review. *N. Am. Butterfly Ass'n*, 977 F.3d at 1260–61 (citing REAL ID Act, sec. 102, § 102(c)(2)). That is particularly true given that PMDD does not now challenge the validity of DHS's July 2 Waiver and does not dispute that DHS has waived the legal requirements of the Rivers and Harbors Act. *See, e.g.*, 33 U.S.C. § 408(b)(1)(A) (imposing legal requirement that review under the National Environmental Policy Act of 1969 "shall . . . occur concurrently" with any review under the Rivers and Harbors Act). PMDD simply contends that DHS's waiver does not and cannot extend to legal prohibitions like Section 408(a). Accordingly, Plaintiff is likely to prevail on its APA and *ultra vires* claims.[3]

## II.    PMDD IS SUFFERING IRREPARABLE HARM

Defendants wholly ignore a host of harms that PMDD *is already experiencing* as a result of the anticipated construction on the levee. These include costs of commissioning a safety study by an architectural and engineering firm, Kennedy Decl. ¶ 62, staff time and resources spent seeking information from the government about its plans and whether it complied with the Section 408(a) process, *id.* ¶ 63, impairment of PMDD's ability to make economic use of its Industrial

---

[3] Besides their flawed reliance on the July 2 Waiver, Defendants hint at other merits arguments in a short footnote. *See* Defs.' Opp. 9 n.2. But by failing to brief those arguments, Defendants have waived them. *See, e.g.*, *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) ("hiding an argument [in a footnote] and then articulating it in only a conclusory fashion results in forfeiture"); *In re Carvalho*, 598 B.R. 356, 361 (D.D.C. 2019) (same). To the extent Defendants even attempt to gesture at any reasoned argument, the footnote appears to suggest that PMDD's "*ultra vires* claim[]" against border wall construction "cannot proceed in federal court" based on *Center for Biological Diversity v. McAleenan*. *See* Defs.' Opp. 9 n.2 (quoting *Ctr. for Biological Diversity*, 404 F. Supp. 3d 218, 235 (D.D.C. 2019)). But in *Center for Biological Diversity*, the plaintiffs did not challenge the border wall as *ultra vires*—they challenged the waiver itself. 404 F. Supp. 3d at 235. The Court held, unsurprisingly, that the plaintiffs' direct attacks on the waiver "ar[o]se from DHS's exercise of the . . . waiver authority" and were unreviewable. *Id.* Here, by contrast, PMDD's claims both predate and do not challenge the July 2 Waiver. *See N. Am. Butterfly Ass'n*, 977 F.3d at 1261; *supra* at 6–7.

Park due to investors' concerns about flood risks, *id.* ¶¶ 65–68, and damage to that land caused by Defendants' contractor, *id.* ¶ 69. As these facts demonstrate, PMDD has and will continue to experience harms from the heightened risk of flooding presented by Defendants' action whether or not that risk ultimately materializes. *See* Pl.'s Mem. 14-15, 23.

While these harms are alone sufficient to establish irreparable injury, Defendants' claim that PMDD is not irreparably harmed because construction on the levee is not imminent and too speculative is also undermined by Defendants' own representations. DHS's immediate reaction to this suit was to waive the Rivers and Harbors Act—conduct strongly indicative of an imminent intent to construct on the levee. In so doing, Defendant Mullin stated that "DHS will take *immediate action* to construct additional barriers" in the Big Bend Sector and determined that waiver of the Rivers and Harbors Act was necessary "to ensure the *expeditious* construction of additional physical barriers." 91 Fed. Reg. at 40550 (emphases added); *see also id.* ("There is presently an acute and immediate need to construct additional physical barriers and roads[.]"). Defendants have also represented that construction on the levee could begin as soon as August, *see* Defs.' Opp. 5—a mere three weeks from now and ten days from the argument on this motion.

While Defendants argue that CBP could still change its construction design, that is unlikely and does not mitigate the harm caused by CBP's repeated representations that it is replacing the earthen levee with a concrete wall. Director Enriquez now claims that CBP may "forego the levee wall portion" because CBP has not yet "approved[] a final design for the levee wall," Enriquez Decl. ¶ 15; *see* Defs.' Opp. 10. But that is a far cry from his representation to PMDD just a few months ago that CBP's "*planned* alignment for the border wall in the Presidio, Texas area . . . is anticipated to follow the existing levee" and that "[t]his *will* involve constructing a reinforced concrete levee wall adjacent to and matching the height of the current levee." Compl. Ex. A, at 1-

8

2 (emphases added). Director Enriquez's declaration is also in tension with repeated representations that CBP made to the U.S. Section of the International Boundary and Water Commission about its plans. *See* E-mail from Senior Attorney, Office of Chief Counsel, Trade and Finance, CBP, to Rebecca Rizzuti, Deputy Chief Counsel, U.S. Section of IBWC (Apr. 1, 2026), https://perma.cc/N22U-F4EX (email from CBP Senior Attorney "[r]esponding for Paul [Enriquez]" to IBWC inquiry about plan for Presidio levee construction and indicating that "[t]he river side of the earthen levee will be replaced with a concrete levee wall with the bollard panels mounted to the top of the concrete wall") (cited in Mary Cantrell, *Trump admin responds to border wall lawsuit by waiving a law at the center of the case*, Marfa Pub. Radio (July 8, 2026), https://perma.cc/B5AM-39FE); Compl. Ex. B, at 1 (Per IBWC letter, "CBP indicated" in December 2025 "that they are planning to convert the earthen levee to a concrete levee wall with the barrier on top."); *id.* ("The USIBWC had a coordination meeting with CBP on March 30, 2026, and our latest understanding is that CBP plans to construct a concrete levee wall on the river side of the existing earthen levee[.]").

In any event, the alternative options that CBP is purportedly now considering would still pose serious risks of flooding and undermining of the levees. As the Tompkins Report warns, "[a]ny infrastructure constructed in or adjacent to a river poses significant risks" and that "is why the licensed professional engineers who design such projects use sophisticated models and incorporate extensive technical analysis before proposing or building such systems." *See* Kennedy Decl. Ex. D, at 3. A wall built "closer to the river," Enriquez Decl. ¶ 15, *i.e.* between the Rio Grande and the earthen levee embankment, could function as an obstruction during storms, trapping debris and turbulent water before they can reach the levee embankment. The force of that violent water and debris could compromise the border wall—such as by causing scouring (erosion)

or even breaking off chunks of concrete or wall panels[4]—channeling damaging high-velocity water and debris into the levees. *See* Kennedy Decl. Ex. D, at 3 (emphasizing risk from "structures placed in and along rivers [that] catch debris during high flows and increase the hydraulic forces acting on those structures and adjacent areas in unpredictable and damaging ways," potentially causing "portions of the wall [to] fail").

Building "behind the existing levees," Enriquez Decl. ¶ 15, *i.e.* between the earthen levee wall and the land it protects, presents comparable risks. The border wall would prevent flash-flooding and mountain runoff from draining into the flood-control project as designed, instead trapping it within, and potentially flooding out, the city and agricultural lands that the levees were designed to protect. *See* Kennedy Decl. Ex. C, at 1, 3 (Johnson Report finding that "border wall" in an area with flash-flooding from mountain run-off, even if built with gates or openings, "would form a long, continuous obstruction across multiple watersheds and flow paths"). Moreover, assuming that border wall were constructed with bollard panels as CBP has historically done, it could enable any flood water escaping the levees to flow into the surrounding community and then, once clogged with debris, trap that flood water inside the community. *See id.* at 2 ("debris can accumulate against wall openings or grates, converting a partially open structure into a dam").[5]

Indeed, several members of Congress have raised similar concerns about flood risk posed by "Smart Wall" construction in the Big Bend Sector. *See* Letter from Members of Congress to Secretary Mullin 2 (June 16, 2026), https://perma.cc/2CCG-XHBR ("Members of Congress

---

[4] Defendants do not specify whether the alternative wall options they claim to be considering would be constructed from concrete or bollard panels. Either way, the wall could function as a dam during storms. As the Johnson Report explains, a wall "would behave as a hydraulic obstruction," and [e]ven where gates, culverts, slots, or openings are installed, the structure would remain vulnerable because floodwater in this environment carries sediment and debris" and "[o]penings can plug quickly." Kennedy Decl. Ex. C, at 1.

[5] For the same reasons, these alleged alternative options would still implicate Section 408(a). The statute prohibits not only building on a levee, but also actions that "injure, obstruct" or "impair the usefulness" of it. 33 U.S.C. § 408(a). Regardless, Defendants fail to argue that their purported alternatives do not violate Section 408(a).

Letter") ("As noted in our prior letter, expedited construction of new technology and roads [in Big Bend] will disrupt the flow of the Rio Grande River, increasing flash flood risk in the park and in Laredo and other communities along the border"); Letter from Members of Congress to Secretary Mullin 1 (Mar. 27, 2026), https://perma.cc/ZM6E-ZNXW ("Construction and maintenance of a border wall segment [in multiple areas of Big Bend]. . . will disrupt . . . river dynamics subject to routine flash flooding"); *id.* ("Border wall construction will create new dangers by disrupting the flow of the Rio Grande River and likely increase deadly flash flood risks.").

Defendants' next argument boils down to "trust us." They claim that PMDD's safety concerns are too speculative to cause irreparable harm as CBP can be counted on to build the levee wall safely without a Section 408 process. Respectfully, CBP's track record invites the opposite conclusion. *See, e.g.*, *DHS Announces Steps to Protect Border Communities from Wall Construction*, DHS (Apr. 30, 2021), https://perma.cc/WT4C-Y4RM (identifying, as part of "the extensive problems created by the prior [Trump] administration's border wall construction," that "[c]onstruction under the prior [Trump] administration blew large holes into the Rio Grande Valley's flood barrier system to make way for a border wall" and "these breaches have threatened local communities" that rely on the system for "protection from catastrophic flooding"); MacKenzie Elmer, *Environment Report: EPA Maps Reveal Flood Impact from Border Wall*, Voice of San Diego (Apr. 24, 2023), https://perma.cc/6STU-GVUA (discussing Environmental Protection Agency's commissioned flood study finding that CBP's design for border construction over Tijuana River could cause "the river [to] back[] up," "breaches [of] levees," and "flood waters [to] consume most of Tijuana's Zona Norte and into downtown"); MacKenzie Elmer, *Mexico Said River Border Wall Broke Treaties. The US Built it Anyway*, Voice of San Diego (Feb. 11, 2025), https://perma.cc/H9EF-5C22 (discussing how CBP proceeded with that Tijuana River design

11

despite EPA's and Mexico's objections; how CBP contractors "piled sediment" on the Tijuana River channel during construction, which could have "obstruct[ed] the high flows expected in the river" had IBWC not raised alarms on the eve of a hurricane; and how in 2019 CBP's "border gates . . . caused massive flooding in Tijuana, triggering rescues and compromising key Mexican plumbing infrastructure that keeps sewage from contaminating U.S. beaches"); Naveena Sadasivam, *The Texas-Mexico Border Wall Comes with a Dangerous, Costly Side Effect: Flooding*, Texas Observer (Aug. 17, 2018), https://perma.cc/TGA6-QE4H (discussing 2014 flood that clogged and toppled border wall in Nogales, Arizona and Mexico; 2008 flood in same area caused by water buildup behind wall, which drowned two people and caused millions in damage; floods near Lukeville, Arizona, where CBP constructed a fence over warnings that it would impede water flow in flash-flood area, debris built up behind the fence causing floods in 2007 as-warned, and DHS-repaired fencing was toppled by flood water again in 2011; 2006 flood in El Paso, Texas, and Ciudad Juarez, Mexico, that caused $800 million in damage and was believed to have been caused, at least in part, by debris caught in CBP infrastructure); GAO-23-105443, *Southwest Border: Additional Actions Needed to Address Cultural and Natural Resource Impacts from Barrier Construction*, Gov't Account. Off. 23 (Sep. 5, 2023), https://perma.cc/WAV8-UJAT (CBP's "barrier system . . . can disrupt the natural flow of water in heavy rain events" that "can occur regularly along rivers and drainages near the border, and barrier-related obstructions can exacerbate flooding, according to National Park Service and Bureau of Land Management officials."). DHS's choice of contractor compounds those concerns. *See* Second Am. Compl. ¶¶ 14, 16–28, *United States v. We Build the Wall, Inc.*, No. 19-cv-00403 (S.D. Tex. Aug. 25, 2021), Dkt. No. 68 (DOJ lawsuit against DHS's Presidio construction contractor for previously building border fence along the Rio Grande without adequate hydraulic analysis); Pl.'s Mem. 12. These

12

many examples show that the risk of harm facing PMDD is not speculative and why potential investors in PMDD land are rationally pricing heightened flood risk into their negotiations.

CBP's representations about how it will conduct a safety review in consultation with IBWC and the U.S. Army Corps of Engineers only raise further alarms. CBP states that "*after* CBP's construction contractor delivers a proposed design" it will have "meaningful and substantive engagement" with IBWC and USACE, who "CBP expects" will "conduct their own [hydraulic and hydrologic] modeling," and that CBP, IBWC, and USACE "will then consult on . . . whether the design . . . is structurally sound, provides the necessary flood protection for the community, and is eligible for accreditation and certification from FEMA," Enriquez Decl. ¶¶ 17–18; *see* Defs.' Opp. 11. While that might sound facially promising, CBP also represents that it could begin construction by August 2026. In other words, CBP thinks that it is possible to complete that entire complicated, multi-agency safety assessment for roughly 13 miles worth of levee wall construction in under 30 days. To put into context how absurd that is, the Section 408 review process for "complex projects . . . can take anywhere from 9 months to more than 2 years." Dep't of the Army, *Portland District: Section 408 Overview and Needed Documents for Review*, USACE, https://perma.cc/ECR8-C9ZJ (last accessed July 10, 2026).

Finally, there is no reason to believe that CBP's alleged coordination with USACE, IBWC, and local officials mitigates Plaintiff's harm. According to reporting, there have been repeated issues in CBP's coordination with IBWC. *See, e.g.*, Naveena Sadasivam, *The Texas-Mexico Border Wall Comes with a Dangerous, Costly Side Effect: Flooding*, Texas Observer (Aug. 17, 2018), https://perma.cc/TGA6-QE4H (noting "IBWC and Border Patrol have long been at odds over border infrastructure" and that CBP failed to notify IBWC that it had built a concrete wall blocking an IBWC flood-control tunnel, which caused flooding); MacKenzie Elmer, *Mexico Said*

13

*River Border Wall Broke Treaties. The US Built it Anyway*, Voice of San Diego (Feb. 11, 2025), https://perma.cc/H9EF-5C22 (noting that CBP contractors "began moving earth in the [Tijuana] river channel the IBWC is charged with managing" without alerting IBWC). USACE has represented that it was not formally engaged by Defendants as of May 11, 2026, and itself had to "contact[] CBP informally to discuss their project." Compl. Ex. C, at 1. And when PMDD contacted CBP seeking the safety analyses, Director Enriquez refused to share them "as a matter of policy." Kennedy Decl. Ex. F, at 1; *cf.* Members of Congress Letter at 2 (noting that the Big Bend Sector "waivers bypass[] all opportunity for stakeholder comment and ignore[] state and federal land managers, local law enforcement, and local residents who know the area best").

PMDD's already accruing injuries as well as its well-founded concerns about the flood risk caused by CBP's planned construction on the levee establish irreparable harm.

## III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR RELIEF

Defendants do not dispute that "[t]here is generally no public interest in the perpetuation of unlawful agency action." Pl.'s Mem. 24 (quoting *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (alteration in original)). That alone is enough to resolve the final two preliminary injunction factors in Plaintiff's favor. *See id.* at 24–25. Because the choice to build a border wall impacting U.S.-built levees without USACE permission violates Section 408(a), Defendants have no legitimate interest in moving forward with construction.

Defendants' primary argument on these factors is to urge this Court to defer to Congress's judgment in Section 102(c) about the need to waive legal requirements for "expeditious construction" along the border. Defs.' Opp. 12 (citing REAL ID Act, sec. 102, § 102(c)(1)). But they have it backwards: Congress reached that judgment with respect to "legal requirements" only, and Section 408(a) is not a requirement. *See supra* § I. Congress's determination about the possible

need to waive one set of laws in no way suggests that Defendants are justified in ignoring an entirely different one prohibiting actions that could jeopardize flood protection and public safety.

As Plaintiff has explained, the harms of staying "Smart Wall" construction in the remote Big Bend region are minimal. *See* Pl.'s Mem. 25. The "Big Bend Sector represents the lowest level of illegal activity along the entire border," and "[t]he rough terrain of Big Bend itself and Mexican lands to the south form a natural wall deterring illegal activity with its rugged terrain." Members of Congress Letter at 1. Defendants' cherry-picked statistics "do not contextualize the number of illegal entry incidents." *Id.* at 2. While Defendants argue that "CBP apprehended over 89,000 illegal aliens in the Big Bend Sector" between fiscal years 2021 and 2025, Defs.' Opp. 12, as CBP itself has touted, only a tiny fraction of those apprehensions—just 3,096—took place in the most recent year, fiscal year 2025. *See Illegal Border Crossings in Big Bend Sector Fall Significantly in FY 2025*, CBP (Dec. 5, 2025), https://perma.cc/2KAT-9LFX ("Big Bend Sector recorded . . . a decline of 74 percent [in apprehensions] when compared to two fiscal years ago."); *see also* Enriquez Decl. ¶ 27 (acknowledging that "apprehension numbers in the Big Bend Sector may have declined recently"); Members of Congress Letter at 1 ("In Fiscal Year 2025 (FY25), Big Bend Sector recorded 0.45% of all illegal border crossings nationwide." (citing *Nationwide Encounters*, CBP (Jun 18, 2026), https://perma.cc/F3DB-BU5Q)). That is because the government's other measures are working: Since fiscal year 2021, the beginning of the five-year period identified by Defendants, Big Bend apprehensions have plummeted by 92%. *See* R.D. Alles, Acting Under Sec'y for Mgmt., *Border Security Status Report: First Quarter, Fiscal Year 2022*, DHS 5 tbl. 1 (Nov. 2, 2022), https://perma.cc/8NY6-CLZZ (37,266 apprehensions in fiscal year 2021); *Illegal Border Crossings in Big Bend Sector Fall Significantly in FY 2025*, CBP (Dec. 5, 2025), https://perma.cc/2KAT-9LFX (claiming "[d]ecisive border security policies and enhanced

15

detection and identification capabilities have contributed to a decline in illegal border crossings" and that "autonomous surveillance towers and other detection technologies are also enhancing the sector's operational effectiveness").

Defendants' claims about drug smuggling likewise overstate the risks. Drug interdictions in Big Bend are lower than other border regions and are mainly made up of marijuana seizures. *Compare, e.g.*, *Drug Seizure Statistics*, CBP (June 18, 2026), https://perma.cc/7V63-4HKW (listing seizures of 9,087 pounds of marijuana, 373 pounds of methamphetamine, 67 pounds of cocaine, 14 pounds of fentanyl, and 3 pounds of heroin in fiscal year 2025 in Big Bend Sector), *with id.* (listing seizures of 22,038 pounds of marijuana, 874 pounds of methamphetamine, 2,015 pounds of cocaine, and 15 pounds of heroin in fiscal year 2025 in Rio Grande Valley Sector); *id.* (listing seizures of 950 pounds of marijuana, 11,311 pounds of methamphetamine, 2,854 pounds of cocaine, 526 pounds of fentanyl, and 66 pounds of heroin in fiscal year 2025 in San Diego Sector); *id.* (listing seizures of 279 pounds of marijuana, 1,716 pounds of methamphetamine, 128 pounds of cocaine, 309 pounds of fentanyl, and 62 pounds of heroin in fiscal year 2025 in Tucson Sector).

Finally, the government suggests that stopping border wall construction "could leave it liable" to its contractors for "delay claims and costs incurred." Defs.' Opp. 13. But Defendants have not provided these contracts, identified any relevant contractual provisions that would create liability, or disclaimed that they contain force majeure clauses or other exceptions for compliance with court orders. The conclusory invocation of legal claims that "could" arise provides no basis for denying preliminary relief, particularly when weighed against the grave and irreparable public harms that could result from levee damage.

In short, Defendants' existing border security efforts are already doing the job. Given this success, a trickle of border crossings cannot justify illegally imposing harm on PMDD and jeopardizing the safety of residents of Presidio and other communities up and down the border.

## IV.   RELIEF AGAINST THE AGENCY ACTION IS APPROPRIATE

Defendants incorrectly claim that PMDD's request for complete relief against the agency action here would be an impermissible "universal injunction," Defs.' Opp. 14 (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 847 (2025)). The D.C. Circuit has already rejected that *CASA* imposes any "limitation on the scope of stay relief under the APA." *Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *34 (D.C. Cir. Nov. 22, 2025); *see CASA*, 606 U.S. at 847 n.10. Nor does PMDD even seek a "universal injunction" here. *See CASA*, 606 U.S. at 837 (defining term as "the power to prohibit enforcement of a law or policy against *anyone*"). PMDD is not asking the Court to stop Defendants from taking any enforcement action against it or others; it is asking to stay or enjoin Defendants' decision to construct in the Big Bend Sector—a singular agency action that is directly harming PMDD. *See* Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 90 Fed. Reg. 48286, 48287 (Oct. 15, 2025) (initial waiver declaring that "the Big Bend Sector is an area of high illegal entry" and thus invoking "authority under section 102 of IIRIRA to install additional barriers and roads in the Big Bend Sector").

Even if *CASA* did supply the appropriate standard, limiting relief to a "12.75 mile stretch of levee wall construction," as Defendants seek, Defs.' Opp. 14, would not provide complete relief here. As described *supra* at 10 n.5, Section 408(a) covers not only building on a levee, but also broader actions that "injure, obstruct" or "impair the usefulness" of a levee. 33 U.S.C. § 408(a). Defendants have already indicated, in response to this suit, that they are now considering other construction designs that are likely to require a Section 408(a) permit and that present the same

17

sorts of flood risks. *See supra* at 9–11. Adopting Defendants' proposed narrow relief would thus fail to protect PMDD from harm.[6]

**CONCLUSION**

For the foregoing reasons, Plaintiff has made a showing of an entitlement to preliminary relief.

Dated: July 10, 2026

Respectfully submitted,

*/s/ Laura B. Bakst*
Laura B. Bakst (DC Bar No. 1782054)
Louis Katz (DC Bar No. 90003861)
Brian Netter (DC Bar No. 979362)
Skye L. Perryman (DC Bar No. 984573)
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
lkatz@democracyforward.org
lbakst@democracyforward.org
bnetter@democracyforward.org
sperryman@democracyforward.org

*Counsel for Plaintiff*

---

[6] If the Court were inclined to grant narrower relief, it should, at minimum, include within it a stay or injunction of construction activities in the Big Bend project area where PMDD is located. *See* Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 91 Fed. Reg. 7297, 7298 (Feb. 17, 2026), *as amended*, 91 Fed. Reg. at 40550 (setting project area as "approximately GPS point 31.037623, —105.579877 and extending south and east to approximately GPS point 29.325866, —104.046466"). While the agency action here is singular—and Defendants advance no argument that it could be severed—issuing relief that covers the DHS-defined project area is the only conceivable alternative way to do so while "prevent[ing] irreparable injury." *Make the Rd. N.Y.*, 2025 WL 3563313, at \*35 (recognizing that where "one severable piece of an omnibus rulemaking is at issue, a district court should postpone the effective date of the severable piece and let the other portions of the rule take effect").

18
